[No. 16130.   Department One.   February 7, 1921.]

## C. O. HOSNER et al., Appellants, v. JOHN W. McDONNELL, Respondent.[1]

LOGS AND LOGGING (55-58)—SALES (10, 22)—DELIVERY AND ACCEPTANCE—EVIDENCE—SUFFICIENCY. Findings that a sale of logs had been made between the parties will be sustained, where the matter depended largely on the credibility of the two parties whose testimony was conflicting, the buyer's conduct being explainable only by accepting the truth of his version that the sale was effected and that he was to send a tug for the logs as soon as they were scaled.

FRAUDS, STATUTE OF (25, 26)—SALE OF GOODS—ACCEPTANCE—DELIVERY. Rem. Code, § 5290, requiring a written memorandum of a sale of goods for $50 or over, unless the purchaser shall accept and receive part of the goods, or make a payment, does not require that the acceptance and delivery be contemporaneous with the making of the contract; but the statute is satisfied where the seller of logs authorizes the buyer to take possession after they are scaled, which was done.

[1]Reported in 195 Pac. 231.

LOGS AND LOGGING (55)—SALE (86, 87)—DELIVERY. A seller's authorization to a buyer of logs to take possession as soon as they are scaled, is a continuing authorization, which shows an intent to deliver the logs to him.

FRAUDS, STATUTE OF (25, 26)—SALE OF GOODS—ACCEPTANCE. There is a sufficient acceptance of logs sold to answer the statute of frauds where the seller had inspected them, agreed to pay for them as soon as scaled at a given price per thousand, and when scaled sent a tug for them and took possession as authorized to do.

SALES (119)—VENDOR'S LIEN—WAIVER. A seller's authority to a buyer of logs to take possession, which was done, is a waiver of a vendor's lien for the price.

NEW TRIAL (40)—NEWLY DISCOVERED EVIDENCE—PROBABLE EFFECT. A new trial for newly discovered evidence should not be granted where it merely corroborated a party upon a disputed point, and would not require a different result.

Appeal from a judgment of the superior court for King county, Jurey, J., entered December 15, 1919, upon findings in favor of defendant, in an action of replevin, tried to the court on the merits. Affirmed.

*Jones, Riddell & Brackett,* for appellants.
*Donworth, Todd & Higgins,* for respondent.

FULLERTON, J.—This is an appeal from a judgment in favor of the respondent, entered in an action of replevin in which the appellants were plaintiffs and the respondent was defendant.

In the year 1919, one J. B. Wood was engaged in the logging business at a place called Squamish Harbor, situated on Hoods Canal. A part of his output consisted of cedar logs. Two separate rafts of cedar logs, the appellant's entire output prior to the transaction now in question, had been sold to the respondent, McDonnell. Sometime in the early part of May, 1919, Wood notified the respondent that he would have another raft of cedar logs ready for delivery about the middle of the month, and on Friday, May 16, the respondent visited the camp for the purpose of inspect-

ing the logs and purchasing them, if he found them satisfactory. The respondent was satisfied with his inspection, and sought to purchase the logs, but Wood was unacquainted with the current market price, and declined to enter into a contract for their sale, but promised to give the respondent the first chance to purchase them when he should determine to sell them. The parties came to Seattle together by boat, arriving there in the early morning of the following day. On reaching the wharf, and just prior to their separation, the respondent again broached Wood concerning the purchase of the logs, when Wood informed him that he would inquire as to the market value of such logs and inform the respondent of his conclusions later in the day. The logs at that time had not been scaled.

As to the subsequent transactions relating to the sale and purchase of the logs, the respondent and Wood are directly at variance. The respondent testifies that Wood called him by telephone before noon of the day they arrived at Seattle, and told him he (Wood) could get eighteen dollars and fifty cents per thousand feet net for the logs, and inquired if he would take them at that price; that he informed Wood he would take them and that Wood thereupon sold them to him at the price named; authorizing him to send a tug for them as soon as they were scaled, which time, Wood informed him, would not be later than Monday or Tuesday of the following week. The respondent further testifies that his lumber mill is on Salmon Bay, near Seattle, inside of the government locks; that he had received notice from the government officer in charge of the locks that the locks would be closed for an indefinite period commencing on the first day of June following, and that he desired to accumulate before that time a sufficient supply of logs to keep his mill in operation during the closed period; that he in-

formed Wood of these matters prior to the time the contract was entered into, and that it was because of this situation that he obtained from Wood the authorization to send for the logs as soon as the scaler had completed his work. The respondent also testifies that he was unable to find Wood in the early part of the week following the making of the contract; but, learning from the scaler himself that the logs had been scaled, sent the tug for them on Thursday, May 20. The tug reached the raft in the afternoon of the same day at about two o'clock. It immediately made fast to the raft, and after some changes in the shifter sticks enclosing the logs, proceeded to tow them to the respondent's mill, reaching there on the following Saturday.

The respondent left Seattle on the tug for the purpose of inspecting other rafts of logs. He arranged, however, with his office to pay Wood for the logs as soon as he could be found.

Wood's testimony relating the agreement to sell and the authorization to send a tow for the logs, as we have said, is directly at variance with that of McDonnell. He admits calling McDonnell on the telephone after their arrival in Seattle on Saturday morning, but relates the conversation between them as follows:

"I told Mr. McDonnell I was offered $18.50 for the logs, and that I was trying to find out the price of logs, and I was calling him up to see whether they were worth that and whether he would give that much, and he said he did not think they were worth that much, but he wanted the logs, and I said 'Well, I am offered that net for those logs and I haven't the scale bill for them yet; I haven't the scale bill, but,' I said, 'as soon as I get the logs scaled I will call you up again and make arrangements with you about the logs.' And Mr. McDonnell said 'I want them, and I will take them,' and I said 'I am not going to sell them to any-

body until I get the scale bill.  After I get the scale bill I am going to give you a chance at the logs' and he said 'Will it be all right for me to send a tug after the logs?' and I said 'No sir, it will not; I am not going to sell the logs until I find out what the scale is on them, and then I will give you a chance at the logs.'  That was the last that was said over the telephone and that was the last I said to Mr. McDonnell until this day, with the exception of the morning when I went to the office.  Mr. Hosner and Mr. Riddell took me out there to tell Mr. McDonnell I did not sell him the logs, which I told him.''

The telephone call was made from the office of Alfred E. Hodgson.  Hodgson had long been Wood's attorney, and was in his office when the telephone conversation occurred.  He heard, of course, only Wood's part of the conversation.  He was a witness at the trial, and his evidence, to some degree at least, supports the version given by Wood.

Wood further testifies that he met the appellant Hosner shortly after his arrival in Seattle on Saturday morning; that Hosner knew he had a raft of logs, and inquired of him whether or not they were for sale; that he told him they were, whereupon Hosner offered him eighteen dollars and fifty cents per thousand feet net for them; that he told him he would inquire further about prices before he sold them, that he had given McDonnell the first chance to buy them, and would not sell them to anyone else until after McDonnell had refused to take them.  He also testifies that he received the scale of the logs on Wednesday and immediately tried to get into communication with McDonnell, but could not find him; that he met Hosner on the next day, and was told by him that McDonnell had sent a tug for the logs; that he said to Hosner that he had not sold the logs to McDonnell and that McDonnell had no right to take them; that thereupon Hosner offered

to buy them at twenty-two dollars per thousand feet
and that he sold them to him at that price, taking Hos-
ner's check in payment, which he cashed two days
later.

Hosner thereafter sold, or contracted to sell, the logs
to his co-appellant, Phoenix Shingle Company. These
parties as plaintiffs brought the present action to re-
cover possession of the logs, causing the sheriff to
seize them on their arrival at Seattle, under a replevin
bond. McDonnell retained possession by the execution
of a redelivery bond. The action was tried to the court
sitting without a jury, with the result hereinbefore
stated.

The appellants first contend that the court erred in
finding that a contract of sale for the logs had been en-
tered into between Wood and McDonnell. On this
question we are constrained to take the view of the
trial court. As we have shown, the immediate parties
thereto are at variance, and the trial court, since he
had the advantage of seeing the witnesses when testi-
fying, was in a much better position to determine the
truth than are we. McDonnell's conduct can be ex-
plained on no other theory than the theory that he
thought he had purchased the logs. He is criticised
because of his apparent anxiety to get possession of
the logs, and because he contracted to purchase them
before they were scaled. But we think his evidence
offers a very satisfactory explanation of this. His
anxiety to obtain immediate possession of logs was be-
cause of the contemplated closing of the locks which
would cut his mill off from its source of supply. The
reason he was willing to contract to purchase the logs
in advance of the scaler's report was because he had
then inspected the logs and knew as much about their
character and quality as did the scaler. To him the
scale would only ascertain the number of thousand

feet and thus fix the total of the purchase price. He did not need the scaler's report to inform himself of their intrinsic value. His testimony to the effect that he had arranged to pay Wood for the logs prior to their arrival at the mill is corroborated, and this fact, we think, weighs strongly in support of his good faith.

On the other hand, the version given by Wood of the telephone conversation is not altogether satisfactory. It is strange that he would call the respondent at all if he had not then determined to sell the logs, and more than this, his version as to parts of the conversation could hardly have taken place if his version of the conversation as a whole were true.

But it is argued that the trial court did not give consideration to the testimony of Mr. Hodgson, and that, when this is considered, it is sufficient to turn the scale in favor of the version given by Wood. Concerning this testimony, we do not read the record as the appellants read it. The court admitted the testimony in evidence when offered, and the most that can be said is that he did not attach to it that degree of importance which the appellants contend it warrants. But the question is before us for trial *de novo*. Appreciating this, we have ourselves given it careful consideration, and are not convinced, when it is considered in the light of all the circumstances shown, that it warrants a reversal of the trial court's finding.

The next contention of the appellant is that the contract of sale, conceding the respondent's version thereof to be true, is void because within the statute of frauds. This contention is founded on the fact that, at the time the contract of sale was entered into, there was no part of the purchase price of the logs paid, nor any delivery of the logs, either in whole or in part, nor anything given in earnest to bind the bargain. But

while it is true the statute (Rem. Code, § 5290) provides that no oral contract for the sale of goods, wares, or merchandise, for the price of fifty dollars or more, shall be "good and valid, unless the purchaser shall accept and receive part of the goods so sold, or shall give something in earnest to bind the bargain, or in part payment," the rule of the statute, as we understand it, does not require that the giving of something in earnest, the part payment, or the acceptance and delivery must in all instances and under all circumstances be contemporaneous in time with the making of the contract of sale. On the contrary, where the goods sold are at a distance from the place of contract, or are of such a nature that they cannot be immediately delivered, and the seller authorizes the buyer to take possession, and he does take possession with all reasonable dispatch after the making of the contract, the sale is not void by reason of the statute. To this proposition there seems to be no substantial dispute in the authorities. In Mechem, Sales, § 401, the rule is stated as follows:

"It is not essential that the part delivery, acceptance and receipt should be at the time of making the contract. The parol agreement, unless revoked, may stand for a mutual agreed proposition, at least for a reasonable time, where none is fixed, and the subsequent acceptance and receipt, while the proposition remains open, of a portion of the goods which were the subject of the parol negotiation, will make the entire contract effective.

"And this is true even though the goods consist of several parcels, or are to be delivered in instalments at different times."

See, also, *Gabriel v. Kildare Elevator Co.*, 18 Okl. 318, 90 Pac. 10, 10 L. R. A. (N. S.) 638, where the cases will be found collected in 10 L. R. A. 638.

The case before us has the added element, not found perhaps in any of the cited cases, namely, that the logs were not to be taken possession of by the buyer until after they were scaled, but we cannot think this in any manner affects the rule. There was an agreement that the logs were to be scaled as soon as possible, and not later than a designated time and an express agreement between the seller and the buyer authorizing the latter to take possession of the logs as soon as they were scaled. The principle underlying the rule is that contracts of this sort are executory, and thus a continuing authorization to either party to do and perform any act contemplated thereby. The contract, until sufficiently performed to take it out of the statute, may be subject to revocation by either party, but if not revoked until some act is done thereunder which so takes it out of the statute, it becomes a binding contract.

We have not overlooked the argument of the appellants to the effect that the acts of Wood, even as testified to by McDonnell, do not show an intent on his part to deliver the logs to McDonnell. But we cannot take this view of the evidence. That nothing was said or done by him subsequent to the time of making the contract evidencing such an intent is freely conceded. But at that time he expressly authorized McDonnell to take the logs as soon as they were scaled. This was a continuing authorization, as potent as it would have been had the parties met subsequent to the time and he had again directed McDonnell to take possession of the logs.

It is also argued that there was no acceptance of the logs by McDonnell. But here again we think the evidence supports the contrary conclusion. McDonnell had inspected the logs prior to the time of the making of the contract of sale, and by the contract agreed to pay for them a given price per thousand feet, the quan-

tity to be determined by the scale. This was a sufficient acceptance, and clearly after taking possession Mc-Donnell could not have repudiated the sale. By his acts he bound himself to pay for them at the agreed price regardless of any other consideration.

It is further argued that Wood had a vendor's lien on the property to secure the purchase price, and that there was no waiver of this lien and in consequence no consummated sale. But the transaction in itself was a waiver of the lien. There was a parting on the part of Wood of both title and possession, and thereafter his sole right was to look to McDonnell personally for the payment of the purchase price.

Finally, it is argued that the court erred in refusing to grant the appellant's motion for a new trial. The motion was based on the ground of newly discovered evidence. Certain persons made affidavit to facts tending to support the testimony of Wood to the effect that a conversation McDonnell testified took place between them did not in fact take place. But, aside from other reasons which could be urged to show want of error, we cannot conclude that, were the evidence in the record, it would require a result different from the result we have indicated.

The judgment is affirmed.

PARKER, C. J., HOLCOMB, BRIDGES, and MACKINTOSH, JJ., concur.