Argued and submitted February 22, 1999, affirmed March 14, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# DAVID BRIAN CARTWRIGHT,
*Appellant.*

## (97 CR 1088; CA A101495)

20 P3d 223

Kenneth A. Morrow argued the cause for appellant. With him on the brief was Morrow, Monks & Sharp, P.C.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge,* and Linder, Judge.

LINDER, J.

---

* Deits, C. J., *vice* De Muniz, J., resigned.

## LINDER, J.

Defendant appeals from a judgment of conviction on eight counts of harassment, ORS 166.065, and two counts of criminal trespass in the second degree, ORS 164.245 (1997). The primary issue presented is whether defendant was entitled, either before or during trial, to inspect a nonparty's "privileged" audiotape recordings for possible inconsistent prior statements of the victim-witnesses. Defendant also challenges the trial court's jury instruction on the meaning of "intimate parts" for purposes of the harassment statute. We affirm.

Defendant was employed as general manager of Southern Curry Ambulance Association, Inc. (SCAA). In the fall of 1997, an SCAA employee complained to SCAA that defendant had sexually harassed her. Other employees later made similar complaints. As part of an internal investigation and in anticipation of civil litigation, officials of SCAA interviewed several employees, asking them questions about defendant's conduct. SCAA officials recorded those interviews on audiotape. Later, defendant was criminally charged with multiple counts of harassment and criminal trespass, allegedly committed against several SCAA employees. Through a combination of subpoenas *duces tecum* and motions to compel, defendant sought to have the taped interviews produced both prior to trial and during trial so that he could inspect them for possible inconsistent statements that might impeach the potential victim-witnesses. In each instance, the trial court declined to order SCAA to release the tape recordings to defendant.

■ The trial court's rulings in that regard are the target of defendant's first argument. On appeal, in a single assignment of error, defendant challenges the trial court's rulings on his various procedural efforts to obtain and review the tape recordings.[1] He argues that he was entitled to the tape

---

[1] As we later explain, there are important distinctions in the procedural devices that defendant used and the analyses that apply to each. Defendant's argument, however, treats the dispositions of his procedural filings and motions as though they were a single ruling, an undifferentiated approach that has complicated our review. Appellate practitioners would be well advised to understand that the requirement in ORAP 5.45 for precisely assigning error is not a mere formality

recordings under the compulsory process guarantees of the state and federal constitutions, notwithstanding SCAA's status as a nonparty to the proceedings and its assertion that the information sought was "privileged as work-product material." The state responds that, to trigger either the state or the federal constitutional guarantee, defendant was required to show that the contents of the tape recordings were both material and favorable to him and that he failed to do so.[2]

■ To put the issue in its proper perspective, we begin by describing in some detail the precise procedural devices that defendant used to seek access to the tape recordings, the procedural timing of those efforts, and the trial court's rulings in response to each. Several weeks before trial was scheduled to begin, defendant served a subpoena *duces tecum* (the first subpoena) on SCAA, directing it to produce the tape recordings made in the course of its investigation.[3] SCAA entered a special appearance and moved to quash the first subpoena on the grounds that defendant had no authority to obtain discovery from a nonparty in a criminal case and the information sought was "privileged as work-product material." Relying on ORS 136.580, Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution, defendant responded to SCAA's

---

but serves to frame the issues, to focus the parties' arguments, and to better identify the legal principles that apply to particular rulings.

 [2] Although the state understandably took no position on this issue at trial, it now has an interest in defending the trial court's ruling in order to preserve defendant's conviction. *See State v. Pelham*, 136 Or App 336, 343, 901 P2d 972 (1995), *rev den* 323 Or 264 (1996). In addition to its argument on the merits, the state argues alternatively that: (1) any error in denying defendant the tape recordings is harmless because of the substantial and compelling evidence of defendant's guilt; and (2) the proper remedy if there is error would be a remand to the trial court for *in camera* inspection of the tape recordings and a corresponding determination as to whether the case must be retried. Because of our disposition of the merits, we do not reach those arguments.

 [3] The first subpoena, and also a second one that we later describe, were served on Dominic Taurone, in his capacity as SCAA's general manager. For our purposes, it suffices to characterize the subpoenas as directing SCAA's appearance. Also, although we refer to this as the first subpoena, in fact defendant directed an earlier one to SCAA as well. Upon SCAA's motion, that subpoena was quashed when defendant and his attorney did not appear for a hearing on SCAA's objections to it. Defendant does not challenge that ruling.

motion by filing a motion to compel production of the tape recordings.[4] Defendant attached to that motion to compel an affidavit of a former SCAA official who was involved in investigating the SCAA employees' allegations that they were sexually harassed by defendant. In the affidavit, the former official stated only that he had recorded statements of "many of the complaining witnesses" and had turned the tape recordings over to another SCAA official. The affidavit contained no representations as to the nature or scope of SCAA's investigation or the substance of the statements made by the witnesses.

The trial court granted SCAA's motion to quash and issued a letter opinion explaining its ruling in detail. The court found, as SCAA had argued, that the tape recordings "were made by corporate officials for corporate purposes" and "to protect themselves from current or future claims by employees."[5] Also, the trial court determined that defendant was using the subpoena *duces tecum* to seek pretrial "discovery" from a nonparty. On that point, the court specifically found that the tape recordings were not in the state's possession or control and had never been provided to the district attorney's office. The trial court further found that defendant

---

[4] Defendant, in his memorandum below, cited the constitutional provisions on which he relied, without specifically stating that his claim was based on the compulsory process guarantee contained in those provisions. The trial court's ruling characterized defendant's argument as being based on confrontation principles. On appeal, defendant for the first time specifically identifies his argument as based on the compulsory process guarantees. The state does not suggest that defendant's arguments in that regard are unpreserved. We agree that, in this particular case, defendant's substantive argument on appeal appears the same as the argument made below and that he merely has labeled it with greater precision. We also agree that defendant's claim primarily invokes compulsory process rather than confrontation principles. Here, he was not restricted in the scope of his cross-examination of witnesses but, rather, was restricted in his access to discovery and potential impeachment materials, which presents a compulsory process issue. *See State v. Zinsli*, 156 Or App 245, 250-52, 966 P2d 1200, *rev den* 328 Or 194 (1998) (discussing difference between confrontation and compulsory process rights).

[5] In particular, SCAA asserted that it interviewed the victim-witnesses in connection both with a possible claim by them or by the defendant, in the event that SCAA took disciplinary action against him. Although the trial court did not expressly declare the tape recordings to be within the work-product doctrine, neither party questions that such a determination was implicit in the trial court's ruling and was the point of the trial court's express finding that corporate officials made the tape recordings to protect themselves from claims by employees.

made no showing that "the alleged victims would testify any differently at trial than they did during their corporate interviews." Concluding that a criminal defendant has no statutory or constitutional right to compel "discovery" from nonparties, the trial court quashed the first subpoena.

Defendant then served SCAA with another subpoena *duces tecum* (the second subpoena) and filed another motion to compel, again seeking to have SCAA appear and produce the tape recordings.[6] SCAA again moved to quash. The matter was heard by a different judge from the one who had quashed the first subpoena. As before, the trial court granted SCAA's motion to quash and issued a letter opinion explaining its ruling. Apparently relying on the earlier ruling, the trial court "assumed" the facts to be that the state was prosecuting defendant for harassment of the alleged victims, that SCAA had interviewed the alleged victims in anticipation of civil litigation, that tape recordings were made of those interviews, and that the state had not reviewed those tape recordings and did not have them in its possession. The trial court quashed the second subpoena, concluding that defendant's constitutional rights to production did not "override the privilege of a non-party." The trial court also denied defendant's motion to compel production of the recordings, similarly reasoning that a person not a party to a criminal case is not subject to a motion to compel.

Defendant made one more procedural effort to obtain access to the tape recordings, this time during trial. After the first victim-witness testified on direct examination, defendant on cross-examination asked her if she had been interviewed by SCAA about the sexual touching that was the subject of the witness's direct testimony and if that interview had been tape-recorded. When she answered affirmatively, defense counsel orally moved that the trial court order SCAA to "produce" the tape recordings, advising the trial court that defendant was relying on the same arguments that he had advanced in support of the subpoenas *duces tecum*. The trial court denied defendant's motion, stating that it was not going

---

[6] The record does not reflect why defendant served a second similar subpoena and filed a second motion to compel. It appears that defendant was seeking reconsideration of the earlier ruling.

to revisit its prior ruling. The trial court reiterated, so "that everyone understands," that the tape recordings were not subject to an "order to compel" because they had never been available to the prosecution and they were in the control of a nonparty rather than the prosecution. Defense counsel responded that he was not seeking "pretrial discovery" but instead was requesting enforcement of the subpoenas.[7] The trial court declined to alter its earlier rulings quashing the subpoenas. Subsequently, in *pro forma* fashion, defendant made the same request after laying the same foundation with each victim-witness, and the trial court, likewise in *pro forma* fashion, denied each of those requests.

In analyzing defendant's claim of right to inspect the tape recordings, we begin by differentiating, in a way that the parties do not, between a criminal defendant's right to pretrial discovery and a criminal defendant's right to produce testimonial or other evidence for use at trial. Fundamentally, pretrial discovery and production of evidence are different concepts. As the Oregon Supreme Court has aptly described, discovery is investigatory or informational in nature:

> "Pretrial discovery is a valid procedural tool; however, it is a 'fishing expedition' in the sense that the searcher does not know what is available for 'catching.' For this reason, the searcher wants to use as large a net as possible. On the other hand, discovery under such circumstances can be abused; therefore, the right of pretrial discovery is limited by statute."

*Pacific N.W. Bell v. Century Home*, 261 Or 333, 339, 491 P2d 1023 (1971), *opinion withdrawn in part by* 261 Or 333, 494 P2d 884 (1972) (discussing general principles of discovery in the context of civil case). *See generally* ORS 135.835 *et seq.* (providing for discovery in criminal cases). Discovery typically relates to the right to receive information and documents from the opposing party in a case and is a reflection of principles that seek to minimize trying cases "by ambush."

---

[7] We note that the earlier subpoenas had been quashed and nothing in the record suggests that defendant had issued a further subpoena to SCAA. Apparently, however, at this stage of the trial, an SCAA official was still in the courtroom and in possession of the tape recordings. Under the circumstances, we overlook the fact that there was no operative subpoena before the trial court, because the trial court itself apparently was willing to overlook that procedural anomaly.

*See, e.g.,* *State v. Dickerson,* 36 Or App 479, 485, 584 P2d 787 (1978) (discussing policies underlying Oregon's criminal discovery statutes, which were modeled on ABA standards). A court's traditional subpoena power, on the other hand, is not a device for a "mere exploring expedition," but instead is a means to produce, at a court hearing or in advance of it, testimony or other materials of known relevance and materiality for evidentiary use in a proceeding. *See State v. Yee Guck,* 99 Or 231, 236-37, 195 P 231 (1921).

◼◼ We first consider whether defendant had a statutory *discovery* right to obtain and inspect the tape recordings.[8] Below, the trial court rejected defendant's pretrial efforts to do so, relying in part on *State ex rel Glode v. Branford,* 149 Or App 562, 568-69, 945 P2d 1058 (1997), *rev den* 326 Or 389 (1998). In that case, this court held that a criminal defendant has no statutory right to informational discovery of materials in the possession of nonparties rather than that of the prosecution. Here, the trial court expressly found that the tape recordings in question were not in the prosecution's possession and had never been reviewed by the prosecution. In light of that finding, which defendant does not dispute, the trial court's ruling was consistent with and correct under the discovery statutes. *See id.*[9]

◼◼ The next question is whether defendant had a statutory right to obtain the tape recordings pursuant to the applicable criminal *subpoena* procedures. As earlier described, a

---

[8] The ill-focused nature of defendant's assignment of error and supporting argument renders it unclear whether he continues to rely on statutory grounds for his claim. We nevertheless consider the statutory provisions governing criminal discovery and subpoenas, despite the parties' failure specially to consider those provisions, because the trial court addressed them below, and it is proper for us to do so before reaching defendant's constitutional claims. *See State v. Warren,* 304 Or 428, 431, 746 P2d 711 (1987) (court should not reach constitutional Compulsory Process Clause argument if the defendant has a statutory right to information sought).

[9] Defendant's labeling of his motions as ones "to compel" rendered the objective of the motions unclear. On appeal, defendant appears to regard the motions to compel as seeking to enforce the subpoenas. The trial court, however, seems to have treated them as motions to compel discovery in the traditional sense—*i.e.,* informational disclosure from the opposing party. That is the more appropriate use of a motion to compel. *See, e.g.,* ORCP 46 (motion to compel available for party seeking discovery from opposing party); ORS 107.089(3)(a) (same in dissolution proceedings). The enforcement mechanism for a subpoena is the court's contempt power. ORS 136.600 (incorporating ORCP 55 G).

subpoena compels the production of evidence. It is not a means of informational discovery, nor does it serve as an investigatory tool to enable a party to examine information or to interview a witness prior to trial to ascertain the existence of relevant evidence or testimony. That observation is consistent with the traditional use of the subpoena power, *see Yee Guck*, 99 Or at 236, as well as the statutes that provide for subpoenas in criminal cases. By express statutory description, a criminal subpoena compels the "attendance of a witness." ORS 136.555. Both the state and a defendant may issue what traditionally has been termed a "subpoena *duces tecum*" by adding to the subpoena a directive that the witness bring with him or her "books, papers or documents." ORS 136.580(1). In a departure with tradition, the statute further allows for the production of subpoenaed materials before trial at the discretion of the trial court:

> "Upon the motion of the state or the defendant, the court may direct that the books, papers or documents described in the subpoena be produced before the court prior to the trial or prior to the time when the books, papers or documents are *to be offered in evidence* and may, upon production, permit the books, papers or documents to be inspected and copied by the state or the defendant and the state's or the defendant's attorneys."

ORS 136.580(2) (emphasis added). The legislature added the provision for pretrial inspection and copying of subpoenaed materials to the statute in 1993. Or Laws 1993, ch 304, § 1. That change, however, did not transform criminal subpoenas into general discovery devices. Rather, the essential character of the subpoena remains, as it traditionally has been, to produce "evidence" to be offered in a court proceeding.

In that regard, Oregon's criminal subpoena procedures are essentially identical to the corollary federal subpoena provision of Rule 17(c) of the Federal Rules of Criminal Procedure, which for many years has provided for pretrial inspection and copying of documents.[10] As the United States

---

[10] Rule 17(c) provides:

"A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that

Supreme Court has emphasized, a subpoena *duces tecum* remains a means for production of evidence, not informational discovery. *See United States v. Nixon*, 418 US 683, 698-99, 94 S Ct 3090, 41 L Ed 2d 1039 (1974). To ensure that their pretrial use does not transform subpoenas into general discovery devices, federal courts are exacting in what a defendant must show to inspect subpoenaed documents before trial. A party seeking pretrial production by subpoena must show: (1) that the documents sought are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without pretrial production and inspection and that failure to produce the documents for inspection pretrial may tend to delay the trial unreasonably; and (4) that their pretrial inspection is not a general "fishing expedition" to ascertain the existence of evidence, rather than to produce specific evidence of known value. *Id.* at 699-700.[11] Applying that four-factor test, federal courts ordinarily quash pretrial subpoenas when the only asserted purpose of production is a party's desire to inspect the materials for possible impeachment material.[12] They reason that, in that circumstance, a subpoena is premature

---

books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."

Rule 17(c) thus differs from ORS 136.580(2) only in that the federal rule provides for quashing a subpoena on the additional basis that production would be unreasonable or oppressive, which is a standard applicable to civil subpoenas in Oregon, *see* ORCP 55 B, but not to criminal subpoenas, *see* ORS 136.600 (providing that only ORCP 55 E and G apply in criminal cases). Beyond that, the federal and state provisions are virtually the same.

[11] In announcing this four-part test under Rule 17(c), the Supreme Court adopted Judge Weinfield's formulation in *United States v. Iozia*, 13 FRD 335, 338 (SDNY 1952), which had been widely followed by lower federal courts for many years.

[12] Federal appellate courts have jurisdiction to review motions ordering production or quashing subpoenas on an interlocutory basis. Although federal courts have occasionally approved of the trial court's pretrial *in camera* inspection of purportedly impeaching materials so that the trial court may be better prepared for ruling on admissibility at trial, they routinely find it to be an abuse of discretion for a trial court to order inspection of such materials by a party before trial. *Compare, e.g., United States v. Cuthbertson*, 630 F2d 139, 144-45 (3d Cir), *cert den* 449 US 1126 (1981) (trial court did not abuse discretion where it did not order production and inspection pursuant to subpoena by moving party and, instead, merely ordered

because impeaching material, such as prior statements of witnesses, "ripens" into evidence only if and when the witness testifies at trial. *See United States v. Cuthbertson*, 630 F2d 139, 144 (3d Cir), *cert den* 449 US 1126 (1981).

Both the text and the policy embodied in Oregon's criminal subpoena provision, ORS 136.580(2), closely parallel that of federal Rule 17(c). We therefore deem the four factors considered in *Nixon* to be appropriate for Oregon trial courts to consider in deciding whether to require pretrial production under ORS 136.580(2). Likewise, those factors are appropriate for us to consider in reviewing the trial court's exercise of discretion in that regard.[13] Here, the trial court found that defendant was seeking the tape recordings as "discovery" and he made no showing that the potential victim-witnesses, if and when called to testify, would make statements inconsistent with any of their prior statements. Defendant does not take issue with those dual conclusions on the trial court's part. Defendant's position simply is that he may use a subpoena directed to a nonparty for such a purpose. He is wrong, for three reasons.

 Under the first factor in the *Nixon* test, defendant must demonstrate that the subpoenaed tape recordings are "evidentiary and relevant." Given defendant's asserted purpose for seeking the tape-recorded statements, an assessment of the evidentiary nature and relevance of the material was impossible to determine pretrial. Defendant wanted to review the tape recordings so that, if the witnesses testified at trial in some way inconsistently with their prior recorded

pretrial *in camera* review by trial court for purposes of later ruling at trial) *with United States v. Fields*, 663 F2d 880 (9th Cir 1981) (trial court abused discretion by ordering nonparty to criminal case to produce possibly impeaching prior statements of witnesses before trial and before witnesses had testified). Federal courts appear to make an exception, if at all, only when: the impeaching quality of the evidence is known, rather than speculative; the witness is certain to testify; and the evidence otherwise satisfies the *Nixon* four-factor test (*i.e.*, midtrial review would delay the proceedings and the evidence is not available from any other source). *See U.S. v. King*, 194 FRD 569, 573-75 (ED Va 2000).

[13] We have not examined legislative history to determine whether Oregon's subpoena statute was modeled on the federal provision. It is not necessary to do so because, in all events, the policies embodied in our state and the federal criminal subpoena provisions are essentially identical, and we adopt the federal test because it appropriately effectuates those policies.

statements, defendant could impeach the witnesses on that basis. Thus, whether the tape recordings would "ripen" into evidentiary material depended not only on whether the victim-witnesses actually testified, but also on the precise substance of their testimony. As we have observed in determining the materiality of testimony or documents in the context of seeking discovery from the prosecution, such determinations are often best made in light of the evidence at trial, rather than beforehand. *State v. Vargas*, 74 Or App 588, 593, 704 P2d 125, *rev den* 300 Or 180 (1985). In the case of assertedly impeaching evidence—especially where the impeachment quality depends on the substance of the testimony at trial[14]—we agree with the many federal courts that have examined the issue that pretrial production and disclosure usually is premature. *See, e.g., Nixon*, 418 US at 701 (need for evidence to impeach witnesses generally is insufficient to require production in advance of trial); *United States v. Fields*, 663 F2d 880 (9th Cir 1981) (abuse of discretion for trial court to enforce pretrial subpoena seeking nonparty records for impeachment purposes); *United States v. Cuthbertson*, 651 F2d 189, 195 (3rd Cir), *cert den* 454 US 1056 (1981) (hearsay documents that could be used only for impeachment purposes may not be obtained by a Rule 17(c) subpoena).

The tape recordings failed to satisfy the first *Nixon* factor for an additional reason. The trial court found that the tape recordings were "privileged work-product material." *See generally Upjohn Co. v. United States*, 449 US 383, 101 S Ct 677, 66 L Ed 2d 584 (1981) (discussing work-product doctrine, its importance, and its scope). Indeed, defendant did not respond to SCAA's motion to quash by disputing SCAA's claim of privilege. Rather, defendant's position was only that

---

[14] Controversies over disclosure and production of impeachment materials frequently have involved evidence that would reveal direct bias or interest, such as immunity agreements or agreements with police that give rise to a witness's self-interest in the success of the prosecution. *See, e.g., United States v. Bagley*, 473 US 667, 105 S Ct 3375, 87 L Ed 2d 481 (1985) (government did not disclose inducements agreements with certain government witnesses that gave the witnesses interest in securing a conviction). The impeaching quality of a prior statement is inherently more speculative when, as here, it is dependent on the substance of the witness's testimony at trial.

his right to produce the tape recordings trumped any privilege. That remains his essential position on appeal.[15] Thus, no question is before us as to whether, in fact, SCAA's tape recordings properly were subject to a privilege or other evidentiary limitation. The only question is whether defendant was entitled to inspect them notwithstanding any such privilege or limitation. Insofar as defendant's *statutory* right to subpoena the tape recordings is concerned, he was not. The trial court's unchallenged conclusion that they were privileged rendered them nonevidentiary, at least in the absence of some constitutional basis to override the privilege. *See, e.g., Upjohn,* 449 US at 398-402.[16] The trial court's finding of privilege *a fortiori* rendered the tape recordings beyond the reach of a subpoena issued under ORS 136.580. *See generally* Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, 5 *Criminal Procedure* § 24.3(f) (2d ed 1999) (describing testimonial and evidentiary privileges as principal grounds for challenging a defendant's subpoena in a criminal case).

Finally, under the fourth factor in the *Nixon* test, the trial court's finding that defendant was using the subpoena as a discovery device also rendered the subpoena insufficient. Defendant's use of the subpoena in this case was a classic

---

[15] On appeal, defendant's argument appears to take issue in passing with the trial court's determination that the subpoenaed materials were privileged. We agree with the state that defendant did not preserve any challenge to SCAA's claim of privilege below. Nor did he assign error to the trial court's findings on the point. We therefore do not reach the state's argument that the circumstances under which the tape recordings were made—*i.e.*, for purposes of an attorney's review and legal advice and, at least partially, at SCAA's attorney's direction—render the tape recordings subject to an attorney-client privilege for confidential communications, as well as subject to the work-product doctrine.

[16] Professor Kirkpatrick describes the work-product doctrine as providing qualified, not absolute, immunity. Laird C. Kirkpatrick, *Oregon Evidence*, 234-35 (3d ed 1996). He bases that characterization on the fact that the legislature, in civil cases, provides for discovery of an opposing party's work product upon a showing of substantial need and hardship. *See* ORCP 36 B(3). Notably, however, no similar exception exists for discovery in criminal cases. *See* ORS 135.855(1). Moreover, consistent with the inherent character of "discovery," the civil and criminal provisions contemplate discovery only from the opposing party to a case, not from nonparties. As to nonparties, any applicable work-product doctrine appears absolute, subject of course to possible constitutional constraints on that status. In all events, even if a necessity and hardship exception qualifies the doctrine in criminal cases for materials possessed by nonparties, defendant made no effort to satisfy such a standard.

"fishing expedition." As already discussed, a criminal sub-poena is not a means to that end. *Id.* (use of criminal sub-poena for discovery is common basis to quash or otherwise challenge issuance of subpoena). Thus, for each and all of those reasons, the trial court properly exercised its discretion to quash the subpoenas.

■■■■ We turn, then, to defendant's assertion of a constitu-tional right to compel production of the tape recordings for inspection, which defendant grounds in the compulsory proc-ess right to obtain "witnesses in his favor." Or Const, Art I, § 11; US Const, Amend VI.[17] The right to compulsory process under Article I, section 11, of the Oregon Constitution, par-allels federal Sixth Amendment jurisprudence. *State v. Mai,* 294 Or 269, 272, 656 P2d 315 (1982); *State v. Beeler,* 166 Or App 275, 283, 999 P2d 479, *rev den* 331 Or 244 (2000). Because the analysis of the two is the same, *State v. Zinsli,* 156 Or App 245, 251-52, 966 P2d 1200, *rev den* 328 Or 194 (1998), we consider both state and federal authorities in our discussion.

■■■■ The right to compulsory process encompasses both a right of discovery and a right to compel the production of evi-dence. Significantly, a defendant in a criminal case has "no general constitutional right to discovery." *State ex rel O'Leary v. Lowe,* 307 Or 395, 404, 769 P2d 188 (1989) (quoting *Penn-sylvania v. Ritchie,* 480 US 39, 107 S Ct 989, 94 L Ed 2d 40 (1987)). Rather, as to discovery, a defendant's constitutional entitlement is limited to information that is: (1) in the posses-sion of the prosecution; and (2) material and favorable to a defendant's guilt or punishment. *See generally Brady v. Maryland,* 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963). More fundamentally, the compulsory process guar-antee also embodies a right to compel the attendance of wit-nesses in the defendant's favor and to require nonparties to

---

[17] Article I, section 11, provides, in part:

"In all criminal prosecutions, the accused shall have the right * * * to have compulsory process for obtaining witnesses in his favor[.]"

The Sixth Amendment to the United States Constitution provides, in part:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have compulsory process for obtaining witnesses in his favor[.]"

produce documentary or physical materials in their possession for the defendant's evidentiary use at trial or in other judicial proceedings. *See generally Nixon*, 418 US at 712-13; *State ex rel Gladden v. Lonergan*, 201 Or 163, 188-89, 269 P2d 491 (1954). But again, the right extends only to testimony or documents that are "material and favorable," *State v. Pelham*, 136 Or App 336, 344-45, 901 P2d 972 (1995), *rev den* 323 Or 264 (1996), or otherwise "demonstrably relevant" and with established "bearing" on the criminal case. *Nixon*, 418 US at 712-13.

 Even upon the requisite showing that the information sought is material and favorable, and demonstrably relevant to a case, the right of compulsory process is not absolute. As we recently observed:

> "[C]ompulsory process does not automatically trump other legitimate concerns and may, for example, be subjected to a state's established rules of evidence and procedure. *Chambers v. Mississippi*, 410 US 284, 302, 93 S Ct 1038, 35 L Ed 2d 297 (1973). Although a state may not arbitrarily deny a defendant's right to present relevant and material evidence, it may subordinate that right to other legitimate interests in the criminal trial process. *Michigan v. Lucas*, 500 US 145, 149, 111 S Ct 1743, 114 L Ed 2d 205 (1991) (denying defendant's Sixth Amendment challenge to the exclusion of evidence regarding his prior sexual relationship with victim because defendant failed to comply with the notice and hearing requirement of Michigan's rape-shield law). A defendant's right to present evidence may be denied if the state's interest in excluding the evidence outweighs the value of the challenged evidence to the defense. *Richmond v. Embry*, 122 F3d 866 (10th Cir 1997) (excluding evidence of the victim's past sexual behavior did not violate defendant's right to compulsory or due process)."

*Beeler*, 166 Or App at 283. Thus, for a defendant to compel the production of privileged or protected materials, the defendant must clear two hurdles. First, the defendant must demonstrate that the testimony or other information sought is not only favorable to him, but is material to the issues in the case. If the defendant so demonstrates, then the defendant must identify an interest in the evidence that outweighs the legitimate interest reflected in the privilege or evidentiary limitation that the defendant seeks to overcome.

■ Both the United States Supreme Court and this court have previously questioned whether the guarantee of compulsory process properly can be understood to displace the most venerable evidentiary privileges. *See Washington v. Texas,* 388 US 14, 22 n 21, 87 S Ct 1920, 18 L Ed 2d 1019 (1967); *State ex rel Meyers v. Howell,* 86 Or App 570, 576-77, 740 P2d 792 (1987). Litigation-related work product potentially is one of those privileges or limitations. *See Upjohn,* 449 US at 398 (noting the "strong public policy" underlying the work-product doctrine for matters related to an attorney's advice or in anticipation of litigation). As in *Howell,* however, we do not need to reach that issue in this case, nor do we need to decide whether defendant's interest in production in this particular circumstance outweighed SCAA's interest in the protected status of the tape recordings.[18] We conclude, instead, that defendant did not make a sufficient showing that the tape recordings contained statements that were material or demonstrably relevant to the issues at trial, a showing that is of particular importance where, as here, any inspection of the protected matter would compromise the confidentiality that the doctrine exists to protect. *See generally United States v. Zolin,* 491 US 554, 109 S Ct 2619, 105 L Ed 2d 469 (1989).[19]

---

[18] For present purposes, we also do not decide whether the constitutional principle would require *pretrial* production, as opposed to production *at trial.* In *State ex rel Upham v. Bonebrake,* 303 Or 361, 366, 736 P2d 1020 (1987), the trial court ordered the district attorney to produce a child witness for the purpose of a pretrial interview with defendant's counsel. In deciding that the trial court lacked authority to so order the district attorney, the Supreme Court noted that its own jurisprudence interpreting the Compulsory Process Clause of the Oregon Constitution "impl[ies] that the compulsory process clause guarantees the right to call witnesses and obtain their testimony *at trial.*" *Id.* (citing *Lonergan,* 201 Or at 188) (emphasis in original). The court also opined that "[e]xercise of the right to compulsory process *may* require that the state not impede defense counsel's access to prosecution witnesses for the purpose of *pretrial* interviews." *Id.* (emphasis added). Whether the right of compulsory process ever extends to inspection, in advance of trial, of materials in the possession of nonparties is a significant question that neither party addresses. But we need not reach it to resolve this case.

[19] Because any inspection of materials subject to an attorney-client privilege or work-product doctrine encroaches on the confidentiality that such a privilege or limitation seeks to preserve, the United States Supreme Court, in an analogous context, has required such a showing not only for a *party's* inspection, but also a trial court's *in camera* inspection:

"[B]efore a trial court may engage in *in camera* review at the request of the party opposing the attorney-client privilege on the basis of the crime-fraud exception, that party 'must present evidence sufficient to support a reasonable

 Again, a defendant must "at least make some plausible showing of how [the witnesses'] testimony would [be] both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 US 858, 867, 102 S Ct 3440, 73 L Ed 2d 1193 (1982). To satisfy that standard, the information sought must be material and favorable "in ways not merely cumulative" to other evidence. *Id.* at 873. To be sure, a defendant's constitutional rights to compel the production of material and relevant information extend to impeaching as well as directly exculpatory evidence. *United States v. Bagley*, 473 US 667, 676-77, 105 S Ct 3375, 87 L Ed 2d 481 (1985). But to conclude that a defendant is entitled to "any and all impeachment evidence" takes "too broad a view" of what the constitution requires. *U.S. v. Presser*, 844 F2d 1275, 1286 (6th Cir 1988). Impeachment evidence is favorable when the evidence is such that, if produced and used effectively, it may "make the difference between conviction and acquittal." *Bagley*, 473 US at 676. Moreover, impeachment evidence is material only if there is a reasonable probability that its use at trial would change the result of the proceeding. *Id.* at 682. *See also Addicks v. Cupp*, 54 Or App 830, 834, 636 P2d 454 (1981), *rev den* 292 Or 568, *cert den* 459 US 842 (1982) (impeachment evidence is constitutionally material only if it would probably impeach a key witness, which in turn would affect the outcome of the trial).

Our reasons for concluding that defendant failed to make the required showing of materiality and favorability parallel, in part, our reasons for concluding that defendant's subpoenas were insufficient under applicable statutory requirements. Here, the first problem for defendant is that his claim that the tape recordings might provide impeaching evidence was pure conjecture, which is not enough. *See State ex rel Meyers*, 86 Or App at 579 (mere assertion that media photos might clear up possible inconsistences between the defendant's and the state's evidence was an insufficient showing of materiality). The conjectural nature of defendant's showing was compounded by the fact that he sought production before trial, at which point the witnesses had not

belief that in camera review may yield evidence that establishes the exception's applicability.' "

*Frease v. Glazer*, 330 Or 364, 372, 4 P3d 56 (2000) (quoting *Zolin*, 491 US at 572).

testified, the materials had not "ripened" into evidence, and the very relevance of the evidence was unknown. *See Zinsli,* 156 Or App at 253 (compulsory process claim best assessed in light of the actual evidence at trial, thereby avoiding "the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed") (quoting *California v. Trombetta,* 467 US 479, 486, 104 S Ct 2528, 81 L Ed 2d 413 (1984)); *Vargas,* 74 Or App at 593.

For purposes of the constitutional analysis, defendant's showing of materiality failed for the additional reason that there was no showing whatsoever that impeaching the witnesses with inconsistencies in their prior statements to SCAA would be significant in the determination of defendant's guilt or innocence. Even abstractly, such a claim would depend at a minimum on the nature of any inconsistencies and whether they were sufficiently central to the victim-witnesses' testimony to bear significantly on their credibility. Again, that could not be determined pretrial. But the more concrete context of the evidence at trial reveals that impeachment with prior inconsistent statements, even if the tape recordings would have provided such inconsistencies, would have been at most cumulative. Defendant possessed all of the victim-witnesses' statements to police, as well as some other prior statements, such as one witness's diary. At trial, defense counsel cross-examined the victim-witnesses, some of them extensively, about inconsistencies between the witnesses' prior statements and their in-court testimony. Defense counsel also made effective, although ultimately unsuccessful, use of those inconsistencies in closing argument.[20] The record of this case simply does not support an assertion that the SCAA tape recordings were material and favorable in ways "not merely cumulative," *Valenzuela-Bernal,* 458 US at 873, of other impeaching evidence that defendant possessed and presented to the jury. Indeed, defendant does not argue otherwise; he relies only on an assertion of an absolute right to the protected, nonparty tape recordings. In all events, on this record, there is no basis to conclude that the outcome of the trial would have been

---

[20] Although the parties do not describe the cross-examinations of the victim-witnesses or the theme of defendant's defense, we have reviewed the numerous audiotape recordings of the trial independently in that regard.

different if the SCAA tape recordings had been available to defendant and had in fact contained inconsistent prior statements. *See Bagley*, 473 US at 676, 682 (stating test for favorability and materiality of impeachment evidence).

 That leaves only defendant's claim that he was entitled to the production of the tape recordings during trial, after each victim-witness had testified on direct examination. The problem with that contention is that defendant made no greater or different showing at that stage of the proceeding. Defendant's position remained that he had an absolute right to compelled production of the tape recordings once each of the witnesses, during cross-examination, acknowledged that the SCAA investigatory interviews were recorded. Necessarily, then, defendant's position is that the constitution entitles him to require a nonparty to produce materials of unknown materiality and favorability, despite the nonparty's claim of privilege, merely because, by taking the witness stand, the witness's credibility is necessarily placed at issue. No case supports his position.[21]

For all of the above reasons, the trial court did not err in granting SCAA's motions to quash defendant's subpoenas *duces tecum*, in denying defendant's pretrial motions to compel production of the tapes, and in denying defendant's motions during trial to produce the tapes.

We turn to defendant's challenge to the trial court's instructions to the jury on the "intimate parts" element of the crime of harassment. The state alleged that defendant harassed the victims by subjecting them to offensive physical

---

[21] Defendant's reliance on *Pacific N.W. Bell*, 261 Or at 338-41, and *State v. Foster*, 242 Or 101, 407 P2d 901 (1965), is misplaced. The legal underpinnings of the holding in *Pacific N.W. Bell* are unclear, but the decision appears to be based on due process principles of a fair exchange of information between the parties to the litigation. The dispute was over a "specific piece of evidence" that was "known to exist and to be in the possession of the adversary counsel" and of "known relevancy." *Pacific N.W. Bell*, 261 Or at 339. Similarly, *Foster* is an early case that is grounded in due process discovery principles relating to materials in the prosecution's possession. Moreover, in each case, the *substance* of the prior statements evidently appears to have been independently relevant and was explored during the witness's direct testimony. That did not happen in this case. Neither *Pacific N.W. Bell* nor *Foster* provides a basis to abandon the settled authority regarding what a defendant must do to assert his compulsory process right to seek information in the possession of nonparties.

contact in the form of "touching the * * * intimate parts" of the victims. ORS 166.065(1)(a)(A), (4).[22] Defendant requested that the trial court instruct the jury that, in order to find him guilty of harassment, it had to find that defendant *knew* that the victims regarded the touched parts as intimate. On appeal, he assigns error to the trial court's refusal to do so. In particular, he argues that the jury must be so instructed because ORS 161.095(2) and ORS 161.115(1) require a culpable mental state to apply to "each material element of the offense that necessarily requires a culpable mental state." Relatedly, defendant also assigns error to the instruction that the trial court did give, which was that the jury could find defendant guilty if it found that "any reasonable person would know that the [body] part touched is intimate."

We review a trial court's refusal to give a requested instruction, and the propriety of the instruction actually given by the court, as a matter of law. *State v. Moore*, 324 Or 396, 427, 927 P2d 1073 (1996); *State v. Rogers*, 313 Or 356, 383-84, 836 P2d 1308 (1992), *cert den* 507 US 974 (1994). A trial court commits no error by refusing to provide a jury instruction that is not a correct statement of the law. *State v. Simonsen*, 329 Or 288, 297, 986 P2d 566 (1999), *cert den* 528 US 1090 (2000). In determining whether the trial court's instructions correctly stated the law, the instructions as given are construed as a whole. *Rogers*, 313 Or at 383-84.

The Oregon Supreme Court's decision in *State v. Woodley*, 306 Or 458, 760 P2d 884 (1988), although not directly controlling, provides the answer to this issue. The defendant in· *Woodley* was convicted of attempted sexual abuse in the second degree under ORS 163.415 (1987). 306

---

[22] ORS 166.065 provides, in pertinent part:

"(1) A person commits the crime of harassment if the person intentionally:

"(a) Harasses or annoys another person by:

"(A) Subjecting such other person to offensive physical contact[.]

"* * * * *

"(4) * * * [H]arassment is a Class A misdemeanor if a person violates subsection (1) of this section by subjecting another person to offensive physical contact and the offensive physical contact consists of touching the sexual or other intimate parts of the other person."

Or at 460. At that time, a person committed the crime of sexual abuse in the second degree if the person subjected another to unconsented "sexual contact." *Id.* As it does now, ORS 163.305(6) then defined "sexual contact" in part as "any touching of the sexual or other *intimate parts* of a person." (Emphasis added.)[23] The issue to be resolved by the Supreme Court was what meaning to give the terms "intimate parts."

The Supreme Court analyzed the text, context, and legislative history of ORS 163.305(6) and concluded that "intimate parts" were ones that the victim subjectively regarded as intimate and the defendant *either* knew that fact *or* a reasonable person would have known that. The court explained:

" 'Intimate parts' are more than 'sexual parts,' but in context the words refer to parts that evoke the offensiveness of unwanted sexual intimacy, not offensive touch generally. * * *

"* * * * *

"First, because the object of the statute is to protect persons from unwanted intimacies, the part must be regarded as 'intimate' by the person touched. This is a subjective test.

"Second, if an accused touched this part knowing that the touched person regarded it as intimate and did not consent, the accused violates the statute * * *. If the accused * * * did not know that the part was 'intimate' to the person touched, the state must prove beyond a reasonable doubt that the accused should have recognized it to be an 'intimate part.' The latter is an objective test.

"In other words, the part must be subjectively intimate to the person touched, and either known by the accused to be so or to be an area of the anatomy that would be objectively known to be intimate by any reasonable person. * * *"

*Woodley*, 306 Or at 461-63.

In *State v. Caffee*, 116 Or App 23, 840 P2d 720 (1992), *rev den* 315 Or 312 (1993), this court implicitly extended the holding in *Woodley* to the crime of harassment.

---

[23] The definitions in ORS 163.305 are applicable to the Criminal Code generally, "unless the context requires otherwise." ORS 163.305(1).

The defendant in that case had requested the trial court to instruct the jury that, in determining whether he had touched a sexual or other intimate part of the victim, the jury should consider only the victim's breast. *Id.* at 26. The trial court instead instructed the jury in accordance with the "subjective/objective" test formulated in *Woodley. Id.* On appeal, this court concluded, without further analysis, that the trial court properly had refused to give the defendant's requested instruction, because there was "sufficient evidence from which the jury could [find] that the victim's lips and legs were intimate parts." *Id.*

We find no persuasive reason to depart from *Woodley* in this context. We therefore now expressly adopt the reasoning of *Woodley* for purposes of the crime of harassment as provided in ORS 166.065(4), and at the same time, we expressly confirm what was implicit in *Caffee.* For the purpose of ORS 166.065(4), an "intimate part" is one that the person touched regards as intimate and *either* the defendant knows that the person touched regards the part as intimate *or*, if the defendant does not know that the person touched regards the part as intimate, a reasonable person would regard the part as intimate. Accordingly, a proper jury instruction relating to what constitutes an intimate part is one that so informs the jury.

■ Here, the trial court instructed the jury about "intimate parts" as follows:

> "[A] body part is intimate if the person touched regarded it as intimate and either the defendant knew that the person touched regarded it as intimate or any reasonable person would know the part is intimate.
>
> "In order to find that a body part is intimate, you must find beyond a reasonable doubt that a person whose body part was touched regarded the part as intimate, and either the defendant knew that the person touched regarded the part as intimate; or any reasonable person would know that the part touched is intimate."

Those instructions were a correct statement of the law relating to "intimate parts" for the purpose of ORS 166.065(4). Accordingly, the trial court neither erred in instructing the

jury as it did nor erred in refusing to give defendant's requested instruction.

Affirmed.