Argued and submitted September 5, 2007, affirmed December 3, 2008, petition for review denied April 22, 2009 (346 Or 185)

Stephanie WILMOTH,
*Plaintiff-Respondent,*

*v.*

ANN SACKS TILE AND STONE, INC.,
an Oregon corporation,
and Kohler Co.,
a Wisconsin corporation,
*Defendants-Appellants.*

Multnomah County Circuit Court
030910094; A127861

197 P3d 567

John M. Cowden argued the cause for appellants. With him on the briefs were Michael A. Griffin and Jackson Lewis LLP.

Maureen Leonard argued the cause for respondent. With her on the brief were Thomas W. Brown, Susan K. Eggum, and Cosgrave Vergeer Kester LLP.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

**ORTEGA, J.**

Plaintiff brought this action against her former employer, Ann Sacks Tile & Stone, Inc. (ASTS), and its parent company, Kohler Co. She alleged that defendants discriminated against her on the basis of sexual orientation and terminated her employment in retaliation for her complaints about unlawful discrimination. A jury found for defendants on plaintiff's unlawful discharge claim under the Portland City Code and her common-law wrongful discharge claim. Her discrimination claim under ORS 659A.030 was tried to the court, pursuant to ORS 659A.885, and, although the court ruled in defendants' favor on aspects of that claim, it found that plaintiff was discharged in retaliation for complaining about what she believed to be unlawful discrimination against a coworker. The trial court awarded damages for back pay, awarded attorney fees, and entered an injunction. Defendants appeal, and we affirm.

Defendants assert five assignments of error, two of which challenge the trial court's ruling for plaintiff on her statutory retaliation claim, one of which challenges the injunction, and two of which challenge the award of attorney fees. The factual dispute central to all the assignments of error concerns the reason for plaintiff's termination. The parties dispute whether plaintiff was fired (1) in retaliation for her complaints about sexual orientation discrimination against Riggs, an ASTS employee with whom plaintiff had a romantic relationship, or (2) because, after learning confidential information in her role as the assistant to ASTS's president, plaintiff disclosed that information to coworkers. As we discuss below, we review the record *de novo* in order to address defendants' challenge to the trial court's ruling for plaintiff on her retaliation claim under ORS 659A.030, and we state the facts as we find them.

Although the trial court did not explicitly state that its findings were based on its observation of the witnesses, it had extensive opportunity to make such observation: 20 witnesses (not including those whose testimony was admitted by way of perpetuation deposition) testified over the course of 11 days and offered competing testimony on many points. The court explicitly noted that it did not find ASTS's former

human resources manager, Clark, to be a credible witness. In our review of the record, we give considerable weight to the trial court's assessment of credibility, whether express or implied by its apparent decision to believe some witnesses over others. *See Union Cemetery Assn. of Crawfordsville v. Coyer*, 214 Or App 24, 34, 162 P3d 1072, *rev den*, 343 Or 691 (2007); *Ettner v. City of Medford*, 178 Or App 303, 308, 35 P3d 1140 (2001).

Plaintiff worked for ASTS from October 2000 until early 2003 as an assistant to Hart, who was then president of the company. Until the end of her employment, plaintiff never received any verbal warnings or discipline. As Hart's assistant, plaintiff had access to his e-mail account and that of a sales director. Consequently, plaintiff had access to some compensation, termination, and performance evaluation information.

Not long after plaintiff began her employment, ASTS experienced a downturn in its business. As a result, some jobs were eliminated and, eventually, wage freezes were instituted. Morale was low, with employees expressing unhappiness about Hart's management and complaining about compensation. Hart acknowledged at trial that there was a lot of gossip in the workplace at the time and that he had spoken to two managers in the marketing department, Hood and Gordon, about their conduct in that regard.

During her employment, plaintiff became friends with Hood and Gordon, as well as their assistants, Tatum and Nelson, and with Westling, who worked in the human resources department. In talking with her friends, plaintiff sometimes disclosed and complained about other employees' compensation. Hood, Tatum, and Gordon testified that they did not hear such information from anyone else in the company.

In the fall of 2002, ASTS made several personnel decisions pertinent to this case. In September, Clark was hired as human resources manager, reporting directly to Hart. Johansen, who had been an employee, began working as a management consultant for the Portland showroom, and plaintiff's girlfriend, Riggs, was hired as administrator for the Portland showroom. A number of plaintiff's coworkers

knew that she and Riggs were romantically involved. A few weeks after Riggs was hired, Williamson was hired as the Portland showroom manager, to whom Riggs would report. Clark testified to a belief that Williamson knew that Riggs and plaintiff were dating; however, Clark testified both that she did not think that she had so informed Williamson and that she told Riggs that she "may have" done so.

After Williamson's first day of work, Riggs related to plaintiff that, during an initial conversation with her new boss, Williamson had informed Riggs out of the blue that she (Williamson) was "not gay." At first, plaintiff thought that Williamson's comment was odd but not offensive. After a few weeks, however, plaintiff began to feel, because of Williamson's treatment of Riggs, that Riggs "was being sort of set up for failure" and that Williamson's early comment indicated that she was prejudiced against gays. Riggs, who was immediately uncomfortable with Williamson's comment that she was "not gay," likewise felt over time that Williamson was sabotaging her and discriminating against her, and she related those concerns to plaintiff.

Within a few weeks, plaintiff began complaining to Clark about Williamson. According to plaintiff, she told Clark that she believed that Williamson might be prejudiced against gays, but Clark did not appear to take the complaint seriously. For her part, Clark recalled plaintiff's complaint about Williamson's comment and about Williamson's management of Riggs, but testified that she did not think plaintiff had made any report of discrimination or harassment.

Plaintiff continued to complain to her friends and to Clark about Williamson's treatment of Riggs. In mid-November, Clark told Hart that plaintiff had reported Williamson's "not gay" comment and was complaining about Williamson's treatment of Riggs. Hart testified that he initially was concerned about potential discrimination and a potential lawsuit, but it soon became apparent that other employees also had complaints about Williamson's management style, and her reported treatment of Riggs seemed consistent with those general management concerns. Hart concluded that, although there was a management issue (indeed, Williamson was terminated in March or April of

2003, after only five or six months of employment), there was no complaint to address regarding discrimination, particularly given that Riggs herself was not complaining.

On December 18, 2002, several months before Williamson's termination, while filing papers in Hart's office, plaintiff saw an e-mail that had been forwarded to Hart from Johansen, the management consultant, in which Johansen expressed the view that Riggs's relationship with plaintiff had the potential to undermine Williamson in the showroom:

> "[Riggs] has some major limitations * * * and were I [Williamson] I would want to replace her. Not only does she lack the multi-tasking and organizational skills necessary to really support the showroom, [but] her relationship with [plaintiff] is a surefire way to undermine [Williamson] and the showroom. The tougher [Williamson] gets on [Riggs] (in order to ensure [that] performance standards are met) the more negative press [Williamson] will get at Central. It will lead to a 'no win' situation."[1]

On seeing the e-mail, plaintiff became very upset. Soon afterwards, she asked Clark how Johansen and Williamson knew about her relationship with Riggs. When Clark responded that "certain people need to know," plaintiff confronted her, stating, "When I find out who has been outing me and [Riggs], I am not going to be happy." Plaintiff also asserted, "You know we have a case if we get an attorney." Clark testified that she did not view the statement as a threat, although she acknowledged that it could be understood that way.

That day or the next day, Clark told Hart about plaintiff's statement that she and Riggs would have a case if they got a lawyer, and Hart became concerned that Riggs would sue, although he did not believe that plaintiff would have any sort of claim. Later that month, Hart sought legal advice from an attorney about potential litigation.

---

[1] Johansen testified that she understood from Williamson that plaintiff and Riggs were roommates and did not know of their romantic relationship until she heard about the litigation.

Shortly after her conversation with Clark, plaintiff went to the marketing office and told Hood, Gordon, and others about Johansen's e-mail. She commented that she could not believe that the company was "paying this person $10,000 a month to worry about my relationship with [Riggs]." Hood, Tatum, and Gordon testified that it was the first time that they heard what Johansen was earning.

Plaintiff admitted discussing Johansen's compensation with Hood and Gordon, but testified that Johansen's compensation was common knowledge. Consistently with that account, a current and a former ASTS employee testified that they too heard about Johansen's compensation, and not from plaintiff. Although plaintiff acknowledged that "nobody should really be discussing other people's compensation," she testified that such conversations were "the environment at [ASTS]. And it certainly had been discussed by several other people * * *."[2] Several former ASTS employees likewise testified to workplace gossip about other employees' compensation and other human resources information, including the results of psychological and intelligence tests that were administered to some new employees. One former employee also testified that he spoke to Hart about the fact that employees were discussing compensation.

Plaintiff's salary disclosures caused Tatum to feel frustrated about her own compensation. Gordon likewise felt bothered by hearing how much Johansen was making "because we weren't getting raises that year and money seemed to be really tight. So I was—I was pretty shocked to hear that salary." Hood also felt that the salary disclosures had a negative effect on morale.

---

[2] According to plaintiff, plaintiff learned at least some compensation information through conversations with coworkers, including Clark's assistant, Westling. Westling testified that some of those discussions were in the context of her and plaintiff's employment duties, but Westling also acknowledged that she might have told plaintiff about a sales director's bonus and criticized his performance and that she had inappropriately disclosed confidential information about another employee. Westling also admitted that she may have told plaintiff that she was frustrated that certain other employees were making more than she was and that she was frustrated with the process for finalizing the termination of another employee.

On December 19, the day after plaintiff's comment to her friends regarding Johansen's salary, Tatum went to Hood to complain that her compensation was too low in comparison to that of others. Tatum viewed her complaint as being about her frustration with her own compensation, not about plaintiff's disclosures. Hood reported Tatum's concern about her compensation to Clark that same day, and soon thereafter Clark jointly interviewed Hood, Tatum, and Nelson. According to Tatum, Clark "said it's been brought to my attention that, you know, you're being told how much other people are making. And, you know, she basically asked us if it was true and * * * what we were being told." Clark took handwritten notes of the meeting, which she later shredded.

Clark did not interview plaintiff and did not interview anyone other than Hood, Tatum, and Nelson about plaintiff. Although she sought to enforce a confidentiality policy with which she believed plaintiff had not complied, Clark did nothing to determine whether other employees had complied with that policy. Clark believed that Johansen's compensation was not well known in the office, but she did not investigate whether that belief was well founded.

Clark reported the results of her investigation to Hart and to Green, a human resources director for ASTS at Kohler to whom Clark indirectly reported. Clark recommended that plaintiff be terminated for breaching the confidentiality policy. She did not have the authority to terminate plaintiff on her own; approval from management at Kohler was required.

Hart was concerned about the disclosures and thought that plaintiff could not continue to work as his assistant. In his view, "basically [plaintiff] was venting. She was frustrated. She was sharing those frustrations, and I felt like it was stirring the pot. There couldn't have been a good purpose for it." Hart spoke directly with Hood, Tatum, and Nelson, although he saw those conversations as focused on finding out how the employees were doing, not on "conducting a parallel investigation."

Plaintiff went on vacation on December 20, two days after finding the e-mail in Hart's office. When she returned

on January 6, Clark and Hart met with her, intending to suspend her and then to terminate her when they received the required approvals from Kohler. Hart had asked Clark to prepare a list of talking points for the meeting because he knew that the meeting would be difficult. Clark included in the list a number of incidents involving e-mails that she believed plaintiff had shared with others, including one occasion from the prior November that Clark had been aware of at the time but had not then viewed as a breach of confidentiality. During the meeting, plaintiff acknowledged discussing Johansen's compensation but denied the other disclosures. She tried to bring to Hart's attention similar disclosures made by other employees, including other employees' previous discussions of Johansen's compensation, but Hart was not receptive to that.

Plaintiff wrote a letter to Hart after the meeting in which she apologized for talking about Johansen's compensation and asked for a second chance. Nevertheless, in a conference call after the meeting, Clark and Hart recommended to Green that plaintiff's employment be terminated because of her disclosures of confidential information.

Four days later, on January 10, plaintiff faxed a letter to Green with a copy to Hart. In it, she stated that she had made complaints about homophobic remarks against herself and Riggs, that Clark had made several offensive comments to her, and that plaintiff believed that she was experiencing retaliation for her complaints about discrimination, in light of the kinds of disclosures often made by others in the ASTS office that did not result in discipline. In response, Green traveled from her office in Michigan to Portland the following week to investigate. Before Green's trip, Clark provided her with a packet of information recounting her own investigation.

Green gave herself one day to complete the investigation. She acknowledged at trial that, before she flew to Portland, she had already decided to recommend that plaintiff be fired. In fact, in her mind, investigation of plaintiff's suspension and termination was not the purpose of her trip to Portland; rather, she was there to investigate plaintiff's

complaints about discrimination. Moreover, Green concluded—despite plaintiff's claims to the contrary—that plaintiff "hadn't raised the issues of discrimination or harassment until after she left the organization. So, you know, she said that she had, but I was not able to confirm that. So it felt like it was something that was exaggerated after the fact that she had been suspended."

During her investigation, Green did not inquire about whether anyone else had ever been disciplined or terminated for breaching confidentiality, whether other employees had made disclosures similar to the ones plaintiff had made, or whether Clark was singling plaintiff out for discipline.[3] In addition to interviewing plaintiff, Green interviewed Hart, Riggs, Williamson, Clark, and Westling, and also Sacks, the chief creative officer for ASTS, to whom plaintiff says she had expressed her concerns about unfair treatment. Clark admitted to Green that she herself had disclosed to plaintiff confidential information (specifically, that Williamson's management style was consistent with her psychological testing). Hart and Clark told Green that the office culture was "gossipy"—but Clark told Green that, as far as she knew, plaintiff and one other person (not Clark) were the only employees who had shared confidential information.[4] Green testified that she did not learn of anyone except plaintiff who had shared compensation information or the contents of others' e-mails. Plaintiff's termination became effective on March 7, 2003.

Clark continued to work for ASTS for about a year after that. At trial, Clark admitted to making inappropriate disclosures while employed there, including the disclosure to plaintiff regarding Williamson's psychological evaluation. On another occasion, Clark referred to an employee's termination paperwork in front of two coworkers, assuming that the coworkers already knew.

[3] Green met with plaintiff as part of her investigation, but plaintiff found her to be unreceptive to hearing about other employees' similar disclosures of confidential information.

[4] That other person reportedly had shared information about another employee's pending termination after finding the information in someone else's e-mail, but resigned before an investigation of his conduct could be completed.

Other employees described additional such disclosures by Clark. Hood testified that Clark had expressed criticism of a sales director (whom Hood did not supervise). Gordon testified that Clark criticized that same sales director to her and complained about his hiring practices. Plaintiff testified that, a few weeks after Clark started working at ASTS, Clark handed her the sales director's psychological evaluation and told her to read it, offering it as an explanation for the sales director's incompetence, about which she had frequently complained.

Clark was terminated in February 2004, about a month after her improper disclosure of termination information. ASTS's new president (who had replaced Hart a few months earlier) testified that the decision had already been made to terminate Clark for other reasons even before that improper disclosure; by that time, the company was already in the process of allowing her a "graceful exit." The termination paperwork referenced the improper disclosure, along with "several instances of distribution of 'misinformation' to managers for the sole purpose of reinforcing an environment of mistrust." It also noted that "mitigating factors in the offer of severance" included the importance of Clark's cooperation in "[a]n ongoing lawsuit" and the possibility that Clark could assert claims relating to the Family and Medical Leave Act. Clark received a severance package of about $26,000, more than the standard payment, after working for ASTS for a little less than a year and a half.

Plaintiff filed this action in September 2003, and the trial took place in November and December of the following year. As noted, plaintiff's claims for unlawful discharge under the Portland City Code and for common-law wrongful discharge were tried to the jury, and her discrimination claim under ORS 659A.030 was tried to the court.

At the close of plaintiff's case, defendants moved for a directed verdict "on all claims"; they argued, in part, that plaintiff had failed to show causation. The trial court denied the motion. Defendants renewed their motion after the close of evidence, and the court again denied it.

The jury returned a verdict on December 7, 2004, finding for defendants on both the city code and common-law

claims. That same day, the trial court ruled from the bench on the statutory claims, rejecting two of the offered bases for statutory liability but concluding that plaintiff was discharged in retaliation for complaining about unlawful discrimination against Riggs. The trial court found that plaintiff had complained to Clark that Williamson was discriminating against Riggs because of Riggs's sexual orientation, that Hart understood that plaintiff had asserted a potential claim of discrimination, and that plaintiff had expressed unhappiness both that Clark was not addressing her complaint and that plaintiff and Riggs's relationship was being treated as a workplace issue. The court found that "Clark knew [that] plaintiff's complaints were escalating and that she was unlikely to let it go. And Clark was scared about what she perhaps dimly perceived was her own misconduct and her own role in the Riggs/Williamson problem." The court also found that Clark, who had been impeached on several matters, was not a credible witness, and that Clark had seized on the complaints of Tatum and Nelson, which really had to do with their own morale, as a basis for discharging plaintiff for breaching confidentiality. The trial court explained its conclusions as follows:

> "Clark seized on this information as a way of getting rid of plaintiff. She took it to Hart in that vein and for that purpose and was successful. * * *

> "In sum, if it were not for plaintiff's complaints of unlawful discrimination, she would not have been suspended or terminated. I conclude even if that information about [plaintiff's] inappropriate—and they were inappropriate—disclosures in the workplace had come to * * * Hart, were it not for Clark's campaign and characterization, the result would not have been termination. That simply isn't credible given all the stuff that other people in this workplace were doing, given the lovely severance packages people were getting in the face of misconduct and seriously undermining the company."

In the course of discussing the relief that would be granted, the court indicated that it would award back pay and would "permanently enjoin[ ] [defendants] from discriminating against [their] employees on the grounds that they oppose any unlawful practice." Plaintiff inquired about

whether the court would set penalties for any violation of the injunction, and the court responded that "we hadn't talked about that. I would want further briefing or oral argument on those issues or both." In response to plaintiff's inquiry about making a request "for prevailing attorney fees on the ground of meritless defense," the court observed that plaintiff could make such a motion but that "given the jury's verdict, you can see that reasonable finders of fact might not reach the same conclusion on the same evidence and issues."

Plaintiff petitioned for attorney fees and proposed a form of injunction shortly thereafter. The proposed injunction, served on defendants on December 22, prohibited defendants from retaliating against employees who reported or opposed discriminatory conduct, required biannual day-long training programs for all employees, and provided for a civil penalty of $100,000 for each discrete violation of the injunction. Five days later, plaintiff served on defendants a proposed form of money judgment awarding $10,758.50 to plaintiff for her claim under ORS 659A.030. Defendants did not file any objections to the proposed money judgment or the proposed injunction.

The trial court signed the money judgment on January 3, 2005 (a week after it was served), and it was entered the following day. On January 5, defendants filed documents in opposition to plaintiff's fee petition and served plaintiff with a memorandum in opposition that was not filed until January 27. In their memorandum, defendants argued that plaintiff was not the prevailing party because the jury had found for defendants; that, under persuasive federal authority, the jury's factual findings govern the equitable claims as well; and that "[t]he jury's verdict in defendants' favor is much more significant to the final outcome of this case than the court's granting plaintiff her equitable relief and economic damages." In addition, defendants contended that plaintiff could not recover fees because the judgment in her favor was less than the amount offered by defendants in an ORCP 54 E offer of compromise. Defendants also made two brief references to the injunction, stating that they objected "to plaintiff's fee request as well as the language of the proposed injunction as improper and unwarranted under the facts of this case and the applicable law" and that "[t]he

terms of the court's injunction, if any, should be limited to its ruling at the conclusion of trial."

Those brief references in a memorandum served on plaintiff but not filed until January 27, were the only opposition defendants registered to the injunction before the trial court signed it on January 10 (two and one-half weeks after plaintiff served the proposed injunction on defendants). The injunction was entered on January 14, 10 days after entry of the money judgment, and on the same day that defendants filed a motion for judgment notwithstanding the verdict. In support of that motion, they contended that, by finding for plaintiff on her statutory retaliation claim, the court had "impermissibly encroach[ed] on the jury's fundamental role as factfinder" and that the jury's factual findings were binding on the court. On January 28—the day after filing their memorandum in opposition to plaintiff's fee petition, in which they mentioned the injunction in passing—they also filed a motion to vacate the injunction, complaining that the court had signed plaintiff's form of injunction without the benefit of briefing or oral argument from defendants. On the merits, defendants contended that injunctive relief was not justified because plaintiff had an adequate remedy at law and faced no appreciable threat of continuing harm and because the hardship to defendants greatly outweighed the benefit to plaintiff. Defendants also argued that the injunction was not framed in clear, precise terms and that the relief requested was too broad.

That same day, the court heard oral argument on defendants' objections to plaintiff's petition for fees. At that hearing, defendants noted the pendency of their motions for a judgment notwithstanding the verdict and to vacate the injunction. The court observed that plaintiff had submitted the proposed injunction and a memorandum in support on December 22[5] and that, after waiting what the court thought to be an "adequate and reasonable time," the court had entered the injunction. The court stated that defendants' references, in their late-filed memorandum in opposition to

---

[5] The memorandum, though served on defendants on December 22, actually was not filed with the court until January 10, the day the court signed the injunction.

plaintiff's fee petition, to their objection to the injunction provided no developed argument in any event and that, in the court's view, "any briefing now is untimely."

On February 4, the court heard argument on defendants' motion for a judgment notwithstanding the court's verdict. The court construed that motion as one for a new trial and denied it.

Finally, on April 15, the trial court heard argument on defendants' motion to vacate the injunction. According to defendants, they had understood that plaintiff was required to submit a motion for an injunction and had believed that their objection in the (late-filed) fee memorandum was sufficient. The court concluded that defendants had waived any objection to the injunction, explaining that the court "probably would not have entered an injunction in as broad a form as plaintiff submitted it after an adversarial hearing and arguments and considering some of the matters you raise now. But the objections are simply untimely * * *." Nevertheless, in August 2005, the trial court modified the portion of the injunction relating to ongoing training, apparently in response to some of defendants' objections.

Defendants appeal, advancing five assignments of error. As noted, two of those assignments of error challenge the trial court's ruling for plaintiff on her statutory retaliation claim. One challenges the injunction, and two challenge the award of attorney fees. Because they are potentially dispositive, we begin with defendant's fifth and first assignments of error, challenging the ruling on the statutory retaliation claim. In the fifth assignment of error, defendants contend that the trial court erred by ruling in plaintiff's favor, because that ruling "directly conflicts with the jury's verdict where both verdicts were based on the same evidence and applied the same legal standards." Plaintiff responds that the claim of error is not preserved and that, in any event, under Oregon law, the jury's factual determinations on plaintiff's claims at law do not bind the trial court's determinations on her claims in equity.

■ We agree that defendants did not preserve their present argument. On the same day that the jury returned its verdict for defendants, the trial court delivered its oral

ruling on the statutory claim, concluding that plaintiff was terminated because of her complaints of discrimination against Riggs. A money judgment disposing of the claim was entered almost one month later. Ten days after that, defendants filed a motion for a judgment notwithstanding the verdict under ORCP 63 A, contending for the first time that they were entitled to a judgment as a matter of law because of the jury's verdict on plaintiff's other claims. After hearing argument on that motion, the court construed defendants' motion as one for a new trial and denied it without making any specific findings on the parties' arguments.

■ ■ The trial court was correct to treat defendants' motion as one for a new trial. A motion for a judgment notwithstanding the verdict is not the appropriate procedure to challenge a claim tried to the court. However, when a motion is so labeled but asks the court to set aside its own judgment and reach different factual findings and conclusions of law, that motion functions as one for a new trial. *Turudic v. Stephens*, 149 Or App 437, 441-42, 943 P2d 1110 (1997). We therefore consider defendants' motion as one for a new trial under ORCP 64.

Defendants do not identify a provision of ORCP 64 under which they would be entitled to a new trial. Indeed, they fail to cite ORCP 64 in their briefs. The essence of defendants' argument is that the trial court committed legal error because it had no power to make factual findings different from the jury's findings on plaintiff's other claims. We therefore understand them to assert that they were entitled to a new trial under ORCP 64 B(6).[6]

---

[6] ORCP 64 B provides:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having fair trial.

"(2) Misconduct of the jury or prevailing party.

"(3) Accident or surprise which ordinary prudence could not have guarded against.

"(4) Newly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at the trial.

Because defendants did not object to the trial court making its own factual findings on the retaliation claim, however, their argument is not preserved. Although defendants assert that "[t]he appropriate time to assert a challenge to the trial court's findings and conclusion was in the post-trial motion for a new trial," they cite no authority for that proposition. Without expressing an opinion on the likelihood of the argument's success, we note that defendants could have argued, at any time before the jury returned its verdict, that the jury's factual findings would be conclusive as to the claim tried to the court. Instead, defendants chose to raise their present argument after the jury reached its verdict, the court made its decision, and the judgment was entered. That choice amounts to speculating on the verdict. By making their present argument for the first time in a motion for a new trial, defendants failed to preserve the argument for our review. *See Roseburg Investments, LLC v. House of Fabrics, Inc.*, 166 Or App 158, 164, 995 P2d 1228 (2000) (concluding that the plaintiff failed to preserve a theory of recovery raised for the first time in a motion for a new trial); *see also Sorenson v. DMV*, 190 Or App 164, 170, 78 P3d 145 (2003) (concluding that ORCP 64 B(6) did not apply where the assertion of legal error was raised for the first time in the motion for a new trial); *Edward D. Jones & Co. v. Mishler*, 161 Or App 544, 566, 983 P2d 1086 (1999) (determining that the plaintiff's argument that the defendant had failed to make a showing required by statute was not reviewable where the plaintiff made the argument for the first time in a motion for a new trial filed after the close of evidence and announcement of the trial court's ruling on the merits).

■■ We turn to defendants' first assignment of error, in which they assert that "[t]he trial court erred when it denied defendants' motion for a directed verdict and rendered a verdict under ORS 659.030(1)(f) in plaintiff's favor." It is unclear whether defendants intended to make one assignment of error (addressing the trial court's denial of one or more of defendants' motions for a directed verdict) or two (addressing

"(5) Insufficiency of the evidence to justify the verdict or other decision, or that it is against law.

"(6) Error in law occurring at the trial and objected to or excepted to by the party making the application."

ORCP 64 C makes ORCP 64 B applicable to an action tried without a jury.

the denial of those motions *and* the trial court's ruling in favor of plaintiff on the retaliation claim). As we have noted in other cases, "[a]ppellate practitioners would be well advised to understand that the requirement in ORAP 5.45 for precisely assigning error is not a mere formality but serves to frame the issues, to focus the parties' arguments, and to better identify the legal principles that apply to particular rulings." *State v. Cartwright*, 173 Or App 59, 61 n 1, 20 P3d 223 (2001), *rev'd on other grounds*, 336 Or 408, 85 P3d 305 (2004). In light of all of defendants' arguments, however, we understand them to be challenging the trial court's ruling on plaintiff's retaliation claim. We review that ruling *de novo*.[7] ORS 659A.885(1)(b); ORS 19.415(3).

The trial court found that, although plaintiff made some inappropriate disclosures, other employees who engaged in misconduct were treated much more leniently than plaintiff was, and that plaintiff would not have been suspended or terminated if she had not complained of unlawful discrimination. On appeal, defendants contend that the evidence did not show that plaintiff opposed sexual orientation discrimination or was terminated because of such opposition. Defendants further argue that the record does not support the trial court's assessment of the witnesses' credibility. Plaintiff responds that defendants failed to preserve those arguments; in her view, defendants moved for a directed verdict only on the claims tried to the jury, the claims on which defendants prevailed below. In any event, she contends, the evidence supported the trial court's decision. We conclude that defendants adequately preserved their argument but that it fails on the merits.

Plaintiff brought the claim at issue under ORS 659A.030(1)(f), which provides that it is an unlawful employment practice "[f]or any person to discharge, expel or otherwise discriminate against any other person because that

---

[7] We would review the denial of defendants' motion for a directed verdict—which we would treat as a motion for a judgment of dismissal under ORCP 54 B(2)—to determine whether plaintiff made a *prima facie* case. *Venture Properties, Inc. v. Parker*, 223 Or App 321, 333 n 6, 338 , 195 P3d 470 (2008). If defendants cannot prevail on *de novo* review, they cannot prevail under that more deferential standard. Accordingly, we do not separately consider the denial of the motion for a directed verdict.

other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so." We have no difficulty concluding that plaintiff opposed sexual orientation discrimination and was fired as a result.

First, plaintiff proved that she opposed sexual orientation discrimination. She testified that she complained that Williamson was treating Riggs unfairly because of Riggs's sexual orientation. Hart testified that he was initially concerned about that complaint as reported to him by Clark, but that his concerns were allayed by his sense that any problems with Williamson related generally to her management style and not to discriminatory treatment of Riggs. Nevertheless, the evidence establishes that he understood that, as of mid-November, plaintiff was complaining about possible discrimination by Williamson against Riggs.

Whether plaintiff's complaints were the cause of her termination presents questions about defendants' motivations for firing her. We conclude that defendants suspended and then terminated plaintiff because of her escalating complaints about Williamson's treatment of Riggs. The day after plaintiff expressed anger over that treatment and mentioned potential litigation to Clark (a concern that Clark passed along to Hart), Clark seized on Tatum's concerns about compensation to begin an investigation of plaintiff's disclosures and recommended plaintiff's termination. Clark had known of one of plaintiff's disclosures for about a month and did nothing about it until plaintiff brought up the possibility of litigation. Other employees—including Clark herself and her assistant, Westling—disclosed confidential information without suffering similar consequences. Although Hart and Clark knew about rampant gossip in the workplace, they made no attempt to determine whether other employees had divulged similar information or to ensure that discipline was applied consistently. And in Green's later inquiry, she allowed herself only one day to investigate, asked no questions that would have allowed her to assess whether plaintiff was being treated differently than other employees who may have engaged in similar conduct, and decided before she even began her investigation to recommend plaintiff's termination.

The record thus supports inferences that plaintiff was singled out for termination as a result of her complaints and that her disclosures were used as a pretext for her termination. Although it may be possible to draw other inferences from the record, when we take into account the trial court's credibility findings, we conclude that plaintiff was terminated because she had opposed what she believed to be unlawful discrimination. We reject without further discussion defendants' arguments regarding witnesses' credibility. The trial court did not err by ruling in plaintiff's favor on her claim under ORS 659A.030.

■ We turn to defendants' challenge to the injunction. In their second assignment of error, defendants contend that "[t]he trial court erroneously imposed an excessively broad, unsupported permanent injunction." Plaintiff responds that defendants did not preserve their assignment of error and that, in any event, the trial court did not abuse its discretion. We agree that the issue is unpreserved.

While announcing its ruling on the statutory discrimination claim, the trial court stated that it would enter an injunction and would want further argument on penalties for violation of the injunction. Plaintiff submitted a proposed form of injunction, but defendants filed no objections. The trial court signed the injunction two and one-half weeks after plaintiff served it on defendants. Two weeks after entry of the injunction, defendants moved to vacate it, explaining their objections to it for the first time. That motion came too late to preserve any error. *See State v. Hammond,* 218 Or App 574, 584, 180 P3d 137 (2008) ("No Oregon appellate decision has ever held that unpreserved prejudgment error can somehow be transmuted into preserved error by virtue of the filing and denial of a post-judgment motion."); *McDougal v. Griffith,* 156 Or App 83, 87, 964 P2d 1135 (1998), *rev den,* 328 Or 330 (1999) (concluding that the plaintiff failed to preserve error concerning the amount of damages where he failed to object to the judgment despite having full knowledge of the damages that the court intended to award). Accordingly, we reject defendants' second assignment of error.

■ Finally, we turn to defendants' challenges to the award of attorney fees to plaintiff. In their fourth assignment

of error, defendants contend that the trial court erred by awarding attorney fees that were incurred after defendants had served an ORCP 54 E offer of judgment, which plaintiff rejected. The trial court ruled that defendants' offer was invalid because it was not filed as required by ORCP 9. We agree.

Addressing defendants' argument requires construction of ORCP 9 and ORCP 54 E. We construe such rules by first examining their text in context and considering rules of construction "that bear on the interpretation of the statutory provision in context, such as the directive, * * * found in ORS 174.010, to interpret statutes with multiple particulars or provisions, to the extent possible, so as to give effect to all." *For Counsel, Inc. v. Northwest Web Co.*, 329 Or 246, 252, 985 P2d 1277 (1999) (citing *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993)). If the legislative intent is clear at the conclusion of that analysis, we proceed no further. *Id.* Here, based on the text of the rules in context, we conclude that the trial court correctly construed the two rules at issue.

We begin with the text of the rules. ORCP 54 E(1) authorizes a party against whom a claim is asserted to "serve upon the party asserting the claim an offer to allow judgment to be given against the party making the offer * * *." If the offer is accepted, then "the party asserting the claim or such party's attorney shall endorse such acceptance thereon, and file the same with the clerk before trial." ORCP 54 E(2). On the other hand, "[i]f the offer is not accepted and filed within the time prescribed, it shall be deemed withdrawn, and shall not be given in evidence on the trial * * *." ORCP 54 E(3).

In addition to the requirement of ORCP 54 E(2) that a party who has accepted an offer of judgment must endorse and file it, ORCP 9 establishes requirements for filing all offers of judgment. That rule provides, in part:

> "A.   Except as otherwise provided in these rules, * * * every * * * offer of judgment * * * shall be served upon each of the parties. * * *
>
> "* * * * *

"C. Except as provided by section D of this rule, all papers required to be served upon a party by section A of this rule shall be filed with the court within a reasonable time after service. * * *

"D. Notices of deposition, requests made pursuant to Rule 43, and answers and responses thereto shall not be filed with the court. This rule shall not preclude their use as exhibits or as evidence on a motion or at trial."

Neither ORCP 54 E nor ORCP 9 D creates an exception to the filing requirement imposed by ORCP 9 A and C for "every" offer of judgment. Therefore, a party who makes and serves an offer of judgment also must file it within a reasonable time.

Contrary to the plain meaning of the rules, defendants contend that unaccepted offers of judgment need not be filed. Noting that the offer of judgment in *For Counsel, Inc.,* was not filed and was nevertheless found to be valid, defendants conclude that the case holds that an offer need not be filed to be effective. The issue in that case, however, was "whether the rule permits pretrial offers to be made inclusive of costs, disbursements, and attorney fees without the opposing party's prior agreement." 329 Or at 249. Because the filing issue apparently was not raised, the court there did not decide the issue now before this court. *For Counsel, Inc.,* therefore does not assist defendants.

Defendants next contend that ORCP 54 E requires only that a party accepting an offer of judgment file the endorsed offer. In defendants' view, filing an unaccepted offer would be illogical, because ORCP 54 E(3) provides that an unaccepted offer is deemed withdrawn and "shall not be given in evidence on the trial." Defendants rely on federal case law and policies favoring confidentiality of settlement discussions. This court cannot, however, impose its own view of logic or policy to ignore the plain requirement of ORCP 9. Although ORCP 54 E(3) provides that an unaccepted offer is deemed withdrawn and is inadmissible as evidence at trial, it does not create an exception to the ORCP 9 requirement that an offer of judgment be served and filed. Accordingly, the trial court did not err by deciding that the unfiled offer of

judgment did not cut off any entitlement to attorney fees and costs.

We reject without discussion defendant's remaining assignment of error, challenging the award of attorney fees for abuse of discretion.

Affirmed.