Argued and submitted October 9, 2008, judgment on claim for negligence reversed and remanded and on sexual harassment claims vacated; otherwise affirmed November 4, 2009

Patti STEELE,
*Plaintiff-Appellant,*

*v.*

Reynaldo MAYORAL,
*Defendant,*

*and*

SALEM-KEIZER SCHOOL DISTRICT 24J,
*Defendant-Respondent.*

Marion County Circuit Court
02C17456; A131363

220 P3d 761

Elizabeth McKanna argued the cause for appellant. With her on the briefs was McKanna Bishop Joffe & Sullivan, LLP.

Kim E. Hoyt argued the cause and filed the brief for respondent.

Martin C. Dolan filed the brief *amicus curiae* for Reynaldo Mayoral.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

**ORTEGA, J.**

Plaintiff appeals from a limited judgment arising from a partial summary judgment in favor of her former employer, defendant Salem-Keizer School District 24J (the district). According to plaintiff, she was sexually harassed and assaulted by defendant Mayoral, who was her supervisor while she worked for the district, and she suffered retaliation after reporting Mayoral's conduct. As pertinent to this appeal, plaintiff asserts claims against the district for sexual harassment, negligence, and retaliation.[1]

On appeal, plaintiff assigns error to evidentiary rulings and to the grant of summary judgment on portions of her sexual harassment claims, her negligence claim, and her retaliation claims. For the reasons set forth below, we lack jurisdiction to consider plaintiff's sexual harassment claims. We reverse the ruling on her negligence claim, do not reach the evidentiary rulings, otherwise affirm the trial court's rulings, and remand for further proceedings.

We view the record in the light most favorable to plaintiff, the nonmoving party, and will affirm the grant of summary judgment only if no objectively reasonable juror could return a verdict in her favor on the matters that are the subject of the motion for summary judgment. ORCP 47 C. Viewed under that standard, the facts are as follows.

Plaintiff worked as a counselor at McKay High School, and Mayoral, the principal, was her supervisor. Each had been given a copy of the district policy, "Preventing Sexual Harassment, Policy and Rules." Supervisors were trained on the policy and were advised in annual training sessions that they should not date their subordinates. According to the district's director of human resources, Weiss, if the district learned that a supervisor was dating a subordinate, the situation would merit inquiry.

The events that gave rise to plaintiff's claims occurred during the 2001-02 school year. Before plaintiff's complaints about Mayoral in March 2002, he had never been

---

[1] Plaintiff's claims against Mayoral and his counterclaims against her remain pending in the trial court. Mayoral is not a party to this appeal, but he filed a brief *amicus curiae*.

counseled or disciplined in any way for sexual harassment. Plaintiff, however, cites reports of several earlier incidents, involving other women, in support of her argument that the district had notice of the risk that Mayoral would engage in harassment and negligently failed to investigate or take corrective action. We summarize that evidence before turning to the evidence of Mayoral's conduct toward plaintiff.

The first report involved an incident, which became widely known in the community, in which another principal physically assaulted Mayoral after finding his wife at Mayoral's home. At the time, Mayoral told Weiss that Mayoral and the other principal's wife were just friends and that she had been at his house to talk. However, the wife, who was not a district employee, reportedly disclosed to another manager that she and Mayoral were involved in a romantic relationship. Weiss believed that Mayoral should have been warned that he should be careful not to become involved in such a situation.

The second report involved a district employee, W. Mayoral told Gelbrich, the district's director of student services, that W "was stalking him because he rebuffed her interest"; Mayoral was very angry at W and wanted her professional license to be revoked. Mayoral also told people that he wanted to get a restraining order against W. Gelbrich passed Mayoral's report on to Gourley, who was then the district's human resources director. Gelbrich also reported her conversation with Mayoral to the district's then-superintendent because she did not believe Mayoral's characterization of himself as W's victim. W wrote to Gourley that she felt that her work environment was "increasingly hostile," describing "working in a contentious situation where I am monitored. The message seems to be about power and it seems personal." W expressed concern about Mayoral's reports that she spent too much time out of the building where she worked; about him monitoring her whereabouts; and about his failure to approve payment for a workshop that she had attended and his denial of her requests to attend another conference and a meeting, while other staff were allowed to participate in similar activities. She threatened to resign unless she was moved to a different position. However, she made no mention of any sexual conduct.

Mayoral was not asked whether he had had a physical or romantic relationship with W, and he did not disclose any such relationship to district officials. During his deposition in this case, however, Mayoral acknowledged that he had had a physical relationship with W and that dating an employee whom he supervised could have caused problems, including the possibility that the employee could make a claim of sexual harassment.

The last report was made by a former employee of the district. A year or so before the incidents that plaintiff complains of, P, who had worked at McKay, complained to Gelbrich about Mayoral. P had left her employment with the district about a year before that conversation. She told Gelbrich that, on one occasion, Mayoral had gone to P's apartment with a female employee of the district and had had sex with one woman (Gelbrich could not remember which one) while the other woman was present in the apartment. P stated that she and Mayoral had had a dating and intimate relationship, but she did not say whether that had occurred during her employment at McKay. P also told Gelbrich that she felt used by Mayoral and was contemplating going to an attorney because she was concerned that Mayoral was "vindictive as hell" and would interfere with her ability to get other jobs. Gelbrich reported the conversation to Weiss and told him that she believed that P had had an intimate relationship with Mayoral.

We move to plaintiff's account of the events that give rise to her claims that Mayoral sexually harassed her. Starting in October 2001, Mayoral began asking plaintiff to join him in nonwork activities, such as going to dinner, seeing a movie, and shopping; before agreeing, plaintiff explained that she was interested in a social, not a sexual, relationship. During some outings, however, Mayoral asked plaintiff sexually suggestive questions, which made her feel uncomfortable. One evening, he kissed her quite forcefully and instigated sexual touching that, again, made her feel uncomfortable.

On the night of March 4, 2002, Mayoral physically and sexually assaulted plaintiff at his home. Over the next two days, plaintiff, who was extremely distraught, discussed

the incident with her family; some friends, including colleagues at McKay; and police officers, including an officer who worked at McKay.

Plaintiff felt that several of Mayoral's actions after the assault were retaliatory. Mayoral, who was not at work on March 5, called plaintiff at home that evening. In the course of that call, he made sexual comments and also asked her to keep what had happened secret; some of his comments about protecting his reputation and his job struck plaintiff as threatening. For the rest of the week, plaintiff noticed that Mayoral was frequently near her office and watching what she was doing. On March 7, during a staff meeting, Mayoral stated that he was thinking about eliminating two counseling positions; plaintiff would have been one of the people cut, and she felt that Mayoral "was setting me up to get rid of me." Plaintiff also points to a later event as retaliatory: in April, after the district began investigating plaintiff's complaint about Mayoral, plaintiff learned that he had made a written complaint with the district, alleging that she had falsely accused him.

Plaintiff made further reports concerning the events of March 4. On March 7, after the staff meeting, plaintiff told Gilmore, an assistant principal, about the assault. On March 8, plaintiff met with a union representative and administrators at the district office and described what had happened on March 4. She was told that Mayoral would be placed on administrative leave pending an investigation, and in fact he was placed on leave that same day (March 8). The district directed Mayoral not to go onto school grounds or contact district employees during the investigation, and plaintiff knew that he had been given that direction. The district told plaintiff it would inform her in advance if Mayoral were allowed to return to work. Plaintiff did not work with Mayoral again after March 8, and she does not claim that she was subjected to any sexual harassment after that date.

The district conducted an investigation of Mayoral's conduct, which is pertinent here because, as discussed below, plaintiff contends that the trial court erred in excluding reports produced as a result of the investigation. The investigator hired by the district, Nove, interviewed witnesses and

submitted a report to the district on April 26, 2002. About two months later, Weiss issued a "Final Investigative Summary." Plaintiff was not provided copies of Nove's report or Weiss's summary at the time that those documents were submitted to the district. In July, the district superintendent, Baker, issued a "Statement of Facts Relied Upon to Support Statutory Grounds for Dismissal of Rey A. Mayoral" and later that month notified Mayoral that she intended to recommend to the school board that he be dismissed.

In the meantime, plaintiff felt uncomfortable at work after Mayoral was placed on leave, and she perceived some conduct as retaliatory. On one occasion, she received an anonymous e-mail that said, "Quit." On another occasion, when she arrived at work in the morning, she found the door to her office unlocked and the thermostat turned up. Although she did not know who was responsible for either incident, she suspected Mayoral or his supporters. Plaintiff reported the incidents to the district, which investigated and changed the locks in her office. There were no further such incidents.

Plaintiff also felt that some other employees were angry with her and appeared hostile. Some colleagues would go to others with work-related questions that should have been directed to plaintiff. Plaintiff learned that one coworker had identified her to another coworker as the assault victim; Gilmore, who was then the acting principal at McKay, advised plaintiff to speak with the coworker who had identified her. Some staff wrote letters in support of Mayoral. Plaintiff testified that, when she went into the staff room, "people would stop talking or get up and leave."

Plaintiff expected that Mayoral "would fight [his] dismissal vigorously." Fearing that he would return to McKay, she resigned her employment in July. Mayoral resigned the following month.

Plaintiff later sued Mayoral and the district. As pertinent here, she asserted a claim for sexual harassment under ORS 659A.030; Title VII claims for sexual harassment under 42 USC section 2000e-2(a)(1), retaliatory harassment under 42 USC section 2000e-3(a), and retaliation under 42

USC section 2000e-3(a); and a claim for common-law negligence in supervising and retaining Mayoral.

Mayoral moved *in limine* to exclude evidence relating to the district's investigation of plaintiff's complaints, and the district agreed that witnesses' statements and the investigative reports were inadmissible. The trial court entered an order excluding evidence about the investigative interviews and reports but left open the possibility of admissibility depending on later developments. The order provided that plaintiff could present evidence to challenge the district's affirmative defense relating to prompt investigation and the admissibility of such evidence would be decided if and when it was offered.

Later, after the district moved for summary judgment, plaintiff's response included Nove's interview notes, letters concerning the investigation, Weiss's Final Investigative Summary, and Baker's Statement of Facts. When the district moved to strike based on the court's earlier ruling, plaintiff withdrew or redacted some exhibits. While acknowledging the court's earlier ruling on the motion to strike, plaintiff stated that she had offered evidence on summary judgment "for the court to make its ruling as to its admissibility for each of the purposes for which it is offered." The trial court granted the district's motion to strike.

The trial court then partially granted the district's motion for summary judgment. Concluding that a reasonable juror could find that plaintiff was subjected to a hostile work environment by events that occurred between March 4 and March 8, 2002, the trial court denied summary judgment on plaintiff's sexual harassment claims. As to plaintiff's negligence claim, the court concluded that

> "plaintiff has failed to produce any evidence to establish that the district acted unreasonably or caused any harm to plaintiff. The facts presented by plaintiff do not rise to a level sufficient for a reasonable juror to find that [the district] acted unreasonably in light of any risk defendant Mayoral may have presented."

As to plaintiff's claims of retaliation, the court concluded that the incidents at issue did not rise to the level of seriousness to constitute an adverse employment action or to establish a constructive discharge.

Pursuant to ORCP 67 B, the trial court entered a limited judgment dismissing a portion of plaintiff's sexual harassment claims, her negligence claim, and her claims for retaliatory harassment and retaliation under Title VII. As to the sexual harassment claims, the judgment was "as to all of plaintiff's claims against defendant district for alleged misconduct that occurred before March 4, 2002," and "as to all of plaintiff's claims against defendant district for conduct that is alleged to have occurred after March 8, 2002."

Plaintiff appeals from that judgment. She contends that the trial court erred in making some evidentiary rulings; in granting summary judgment as to all portions of her sexual harassment claims relating to events that occurred before March 4 and after March 8, 2002; and in granting summary judgment on her negligence and retaliation claims.

■ We begin with a jurisdictional issue concerning the judgment on plaintiff's sexual harassment claims. As noted, the limited judgment purports to dispose of those claims insofar as they arise from conduct that occurred before March 4 and after March 8, 2002, leaving for trial the portion of those claims arising from conduct that occurred between March 4 and 8. That ruling, however, is not the proper subject of a limited judgment. A portion of a claim may not be disposed of by a limited judgment; rather, a limited judgment must dispose of a whole claim or of all claims against a party. ORCP 67 B (providing, in part, that "the court may render a limited judgment as to one or more but fewer than all of the claims or parties"); *Interstate Roofing, Inc. v. Springville Corp.*, 347 Or 144, 152, 218 P3d 113 (2009) ("A purported judgment document must reflect the concluding decision of one or more claims, or it does not meet the statutory definition of 'judgment document.' "); *Lesch v. DeWitt*, 317 Or 585, 589-90, 858 P2d 872 (1993) (holding that dismissal of a portion of a claim is not a proper subject of a limited judgment); *Vinsonhaler v. Quantum Residential Corp.*, 189 Or App 1, 7, 73 P3d 930 (2003) (explaining that a limited judgment purporting to dispose of a portion of the plaintiffs' sexual harassment claims was not reviewable). Because the limited judgment from which plaintiff appeals cannot and therefore did not dispose of a portion of her sexual harassment claims, we express no opinion of the merits of the trial court's summary judgment ruling on those claims. On remand, that portion of the limited

judgment should be vacated. *Bertram v. Malheur County*, 341 Or 392, 143 P3d 544 (2006).

██ We turn to plaintiff's assignment of error addressing the grant of summary judgment on her negligence claim, in which she asserted that the district acted negligently in its supervision and retention of Mayoral. As the Supreme Court explained in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987),

> "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

Here, plaintiff invokes duties that the district owed under statutes and administrative rules, and she also contends that the district was negligent under general principles of foreseeability.[2] In plaintiff's view, the key issue is "whether the district exercised reasonable care, considering the duties and obligations of conduct required of it in response to defendant Mayoral's inappropriate acts of which the district knew or should have known prior to his assault on plaintiff." She argues that the district violated duties that arose by virtue of the employment relationship and by virtue of statutes and administrative rules that require employers to prevent harassment in the workplace, require school districts to adopt sexual harassment policies and investigate complaints about behavior that may violate such policies, and require school districts to report sexual harassment by certificated personnel to the Teacher Standards and Practices Commission.[3]

---

[2] Although plaintiff contends that the district owed her duties as a consequence of the special relationship between employer and employee, she does not identify any duties created by that relationship other than duties owed under the statutes and rules. Accordingly, we do not separately analyze those duties as part of a special relationship.

[3] Specifically, plaintiff relies on ORS 659A.030(1)(b) (providing, in part, that it is an unlawful employment practice for an employer to, because of an individual's sex, "discriminate against such individual in compensation or in terms, conditions or privileges of employment"); ORS 342.700 (establishing state policy "that sexual harassment will not be tolerated in schools" and requiring school districts to adopt policies on sexual harassment); ORS 342.704(2)(c) (requiring the State Board of

She further contends that the district's conduct created a foreseeable risk of harm to her, given what the district knew or should have known about Mayoral's previous conduct toward female employees. Plaintiff argues that, "[h]ad the district performed a timely, adequate inquiry, it is reasonable to assume that the district would have terminated defendant Mayoral's employment long before March 4, 2002, the date of plaintiff's assault."

The district responds that its duties to plaintiff are established by statutes and rules and that general foreseeability principles therefore do not come into play. The district contends that it complied with its obligations under those statutes and rules and that, in any event, the events cited by plaintiff simply did not put it on notice of a risk of sexual harassment and, thus, it could not reasonably foresee the risk that plaintiff would be subjected to sexual harassment.

We agree with plaintiff that a reasonable juror could conclude that the district violated its duties under the cited statutes and rules by failing to investigate and discipline Mayoral for sexual harassment before plaintiff was assaulted. Specifically, P, a former employee, reported that she and Mayoral had dated at some point. P complained that she felt used and feared that Mayoral would prevent her from getting jobs with the district and other school districts. She expressed concern that Mayoral was "vindictive as hell." P's report was not specific about whether she and Mayoral had had a sexual relationship while P was employed at McKay under Mayoral's supervision, but her report was made about a year after she left the district.

The conduct of which P complained potentially violated the district's sexual harassment policy. The district instructed supervisors that a dating relationship between a supervisor and a subordinate would be inappropriate, and

Education to adopt requirements for school district policies on sexual harassment, including a requirement that "[a]ll complaints about behavior that may violate the policy shall be investigated"); OAR 584-020-0040(4)(l) (defining, by rule of the Teacher Standards and Practices Commission, "gross neglect of duty" to include sexual harassment); and OAR 584-020-0041 (requiring school district's chief administrator to report when "the chief administrator reasonably believes the person may have committed any act which may constitute" an act of gross neglect of duty).

Weiss testified that such a relationship would merit investigation. Given that P had been employed with the district a year before making her report, a reasonable juror could conclude that the district should have inquired whether the dating relationship that she reported occurred while Mayoral was her supervisor. P also complained that she was concerned that Mayoral would prevent her from obtaining other employment positions, apparently as a consequence of their past sexual relationship, conduct that would constitute sex discrimination. It follows that a reasonable juror could find that the reported conduct may have violated the district's sexual harassment policy and, therefore, that P's report triggered the district's duty to investigate "[a]ll complaints about behavior that *may* violate the policy," ORS 342.704(2)(c) (emphasis added). Apart from the issue of whether it had prior notice of possible sexual harassment by Mayoral, we do not understand the district to make any other argument in support of affirming summary judgment on plaintiff's negligence claim. The trial court erred in granting summary judgment in the district's favor on that claim.

■ We turn to plaintiff's contention that "[t]he trial court erred by excluding, under OEC 403, admissions by defendant district and other proof in its own investigative reports that a sexually hostile environment had been created over the five years defendant Mayoral was employed." (Boldface omitted.) Given our disposition of the sexual harassment and negligence claims above, it is not clear that the exclusion of that evidence has an effect on any issue on appeal. In any event, we conclude that defendant has not assigned error to a ruling that we can review at this stage of the proceedings.

To begin with, because the ruling at issue is unclear, plaintiff's assignment of error does not comply with ORAP 5.45(3): "Each assignment of error shall identify precisely the legal, procedural, factual, or other ruling that is being challenged."[4] Given the substance of plaintiff's arguments, however, we understand her to challenge the trial court's ruling on the motion *in limine*.

---

[4] We again remind practitioners of the importance of the requirement to precisely assign error, which helps to frame the issues, focus arguments, and better identify applicable legal principles. *Wilmoth v. Ann Sacks Tile and Stone, Inc.*, 224 Or App 315, 332, 197 P3d 567 (2008), *rev den*, 346 Or 185 (2009).

Moreover, the trial court's ruling on that motion is not reviewable, because it was not final. The court's ruling left the door open to further consideration—as plaintiff herself recognized in later briefing on summary judgment seeking to submit evidence of the investigative reports. This case is similar to *Hayes Oyster Co. v. Dulcich*, 170 Or App 219, 232-34, 12 P3d 507 (2000), where—in an appeal arising after a jury trial—the plaintiff attempted to challenge two pretrial evidentiary rulings. As to each of those rulings, the trial court had observed that the issue might be reconsidered at trial. We concluded that those open-ended rulings were not final and that the "nonfinal, pretrial rulings were not error." 170 Or App at 234 (citing *State v. Jackson*, 68 Or App 506, 513, 683 P2d 120, *rev den*, 297 Or 546, *cert den*, 469 US 983 (1984)). Here, likewise, the trial court's ruling on the motion *in limine* was not its final word on the admissibility of the evidence. Without a final ruling, we have nothing to review. *State v. Tyler*, 213 Or App 109, 115, 159 P3d 1218, *rev den*, 343 Or 467 (2007).

Although plaintiff later raised the evidentiary issue again when she submitted evidence in support of her response to the district's motion for summary judgment, she does not assign error to the trial court's ruling on the district's motion to strike that evidence—the ruling that finally determined the admissibility of the evidence for purposes of the summary judgment record. The failure to assign error precludes our review of that ruling. ORAP 5.45(1); *Husky Lbr. Co. v. D. R. Johnson Lbr. Co.*, 282 Or 481, 487 n 2, 579 P2d 235 (1978); *Olsen v. Deschutes County*, 204 Or App 7, 21-22, 127 P3d 655, *rev den*, 341 Or 80 (2006). Accordingly, there is nothing in plaintiff's first assignment of error that this court can review at this stage of the proceedings.

In her second assignment of error, plaintiff challenges the admission of police reports relating to the March 4 assault. The trial court ruled that it would consider the evidence on summary judgment but left for future resolution the question whether the reports would be admissible at trial. We have not considered that evidence in resolving any issue on appeal; hence, we do not reach the question whether admission of the reports in connection with the summary judgment was error.

We turn to plaintiff's arguments concerning her retaliation claims under Title VII.[5] In her sixth assignment of error, plaintiff contends that the trial court erred in concluding that she had not suffered an adverse employment action that would support her claim for retaliatory harassment. In her seventh assignment of error, plaintiff argues that the trial court erred by concluding that her working conditions did not rise to the level of a constructive discharge that would support a retaliatory discharge claim.

■ A *prima facie* case of retaliation under Title VII requires a showing that (1) the plaintiff engaged in protected activity opposing discrimination; (2) the plaintiff experienced a materially adverse action, that is, an action that a reasonable employee would find materially adverse; and (3) a causal connection exists between the protected activity and the adverse action. *Somoza v. University of Denver*, 513 F3d 1206, 1212 (10th Cir 2008). An adverse action need not affect the terms or conditions of employment. *Burlington N. & S. F. R. Co. v. White*, 548 US 53, 64, 126 S Ct 2405, 165 L Ed 2d 345 (2006). It must, however, be material: The anti-retaliation provision of Title VII protects an employee

> "not from all retaliation, but from retaliation that produces an injury or harm. * * * [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

548 US at 67-68 (citations and internal quotation marks omitted).

Materially adverse actions are distinct from trivial harms, such as personality conflicts or snubbing by coworkers and supervisors; typically, "petty slights, minor annoyances, and simple lack of good manners" will not deter complaints by victims of discrimination. *Id.* at 68. In determining whether a harm is trivial or material, context matters. Thus,

---

[5] Under 42 USC § 2000e-3(a), it is an unlawful employment practice for an employer to, among other acts, discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

for example, a supervisor's refusal to invite an employee to lunch normally would be a mere slight, but exclusion from training lunches that were significant for professional advancement might be materially adverse. *Id.* at 69. The Supreme Court has emphasized that, in analyzing materiality,

> "the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint. By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."

*Id.* at 69-70.

■　　Here, plaintiff contends that she was subjected to retaliation by Mayoral, who made threatening remarks and watched her closely from March 5 to 8, and that, after Mayoral was placed on administrative leave, she received an e-mail that said, "Quit"; found one morning that someone had entered her locked office and turned the heat up; was not asked some questions that she, as lead counselor, should have been asked; and felt hostility from other employees. In plaintiff's view, the evidence would allow a jury to find that she was subjected to a retaliatory hostile work environment and a constructive retaliatory discharge in violation of Title VII.

In analyzing plaintiff's hostile environment claim, we begin with Mayoral's conduct between March 5 and 8— making threatening comments, watching plaintiff closely, and suggesting that her job might be eliminated. Even if we assume that Mayoral's conduct was prompted by plaintiff's complaint of harassment violating Title VII and thus was retaliation because of protected activity, that conduct did not deter plaintiff from making reports of Mayoral's conduct, including a complaint to district administrators on March 8. *See Somoza*, 513 F3d at 1214 (explaining, in affirming summary judgment on retaliation claims, that "the fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to

whether the actions are sufficiently material and adverse to be actionable"). After March 8, plaintiff was shielded from further contact with Mayoral. The district placed him on administrative leave and directed him not to contact plaintiff, and plaintiff was not subjected to any further sexual harassment. Under the circumstances, a reasonable employee would not be deterred from making a complaint because of Mayoral's conduct in the days immediately preceding his placement on leave.[6]

■■ We turn to the other conduct that plaintiff cites in support of her hostile environment claim. The e-mail incident and the incident in which someone entered plaintiff's locked office and turned the heat up were isolated incidents that were investigated and did not recur. Although plaintiff felt that some of her coworkers were hostile toward her and supportive of Mayoral, she does not cite any conduct that rises to the level of actionable retaliation. Conduct such as unruly behavior during a meeting, derogatory e-mails, or an angry outburst and ostracism do not rise to that level. *Somoza*, 513 F3d at 1214-15, 1217-18 (concluding, as a matter of law, that the plaintiffs did not experience materially adverse action where they were laughed at during a department meeting, endured continued hostility from other individuals, and experienced a junior coworker's rudeness, criticism, and lack of cooperation).

■■ Although some of plaintiff's colleagues directed to others some questions that should have been directed to plaintiff, there is no evidence that that conduct significantly altered her duties in a way that would deter Title VII complaints by a reasonable employee. A minimal change in job responsibilities is not enough to constitute a materially adverse action. In general, for example, a transfer or reassignment of job responsibilities "is not materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens v.*

---

[6] Nor was Mayoral's subsequent assertion that plaintiff had falsely accused him materially adverse. A reasonable employee would not be deterred from complaining to her employer about harassment simply because, during an investigation of her complaint, the accused harasser denies the truth of the complaint and accuses the employee of lying.

*Erickson*, 569 F3d 779, 791 (7th Cir 2009) (emphasis in original). Thus, in *Stephens*, changes in some of the plaintiff's job duties were not materially adverse, as a matter of law, where the new tasks were "not dirtier, more arduous, less prestigious, or objectively inferior" but differed only minimally from his earlier duties and did not keep him from using his job skills. *Id.; cf. Burlington N. & S. F. R. Co.*, 548 US at 70-72 (concluding that a jury was entitled to find actions materially adverse where the plaintiff was reassigned from forklift duty to track laborer duties, which were more arduous, dirtier, less prestigious, and generally considered less desirable, and where the plaintiff was suspended without pay for 37 days, undergoing financial hardship before ultimately being reinstated with back pay). Here, although plaintiff's work environment caused her some distress, the actions as a whole do not, as a matter of law, rise to the level of a material adverse action that would deter a reasonable employee from invoking the protections of Title VII.

 We turn to plaintiff's claim that she was constructively discharged in violation of Title VII. An employee is constructively discharged when she quits because her working conditions become so intolerable that a reasonable person in her position would have felt compelled to resign. *Pennsylvania State Police v. Suders*, 542 US 129, 141, 124 S Ct 2342, 159 L Ed 2d 204 (2004). Where the resignation is an outgrowth of a hostile work environment, the plaintiff must prove more than severe or pervasive conduct:

> "To establish hostile work environment, plaintiffs * * * must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.' Beyond that, we hold, to establish 'constructive discharge,' the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response."

*Id.* at 133-34 (citations omitted; brackets in *Suders*).

Here, plaintiff contends that she was constructively discharged because of a retaliatory hostile environment claim and her fear of Mayoral. Because that evidence was insufficient to establish an adverse action or hostile work environment, it cannot satisfy the higher standard required

for constructive discharge. *O'Brien v. Department of Agriculture,* 532 F3d 805, 810-11 (8th Cir 2008). Accordingly, the trial court did not err by dismissing plaintiff's retaliation claims under Title VII.

Judgment on claim for negligence reversed and remanded and on sexual harassment claims vacated; otherwise affirmed.